David and Carolyn GASKELL,
Plaintiffs, Appellants,

v.

The HARVARD COOPERATIVE
SOCIETY, et al., Defendants,
Appellees.

David and Carolyn GASKELL,
Plaintiffs, Appellees,

v.

The HARVARD COOPERATIVE
SOCIETY, et al., Defendants,
Appellants.

Nos. 93–1024, 93–1102.

United States Court of Appeals,
First Circuit.

Heard May 5, 1993.

Decided Aug. 25, 1993.

Norman H. Jackman with whom Martha
M. Wishart and Jackman & Roth, Boston,
MA, were on brief, for plaintiffs, appellants.

**496**

Francis J. Lawler with whom Robert M. Shea and Peabody & Brown, Boston, MA, were on brief, for defendants, appellees.

Before TORRUELLA, OAKES * and CYR, Circuit Judges.

CYR, Circuit Judge.

This case presents several important issues relating to group health plan "continuation coverage" under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), P.L. 99–272, 100 Stat. 82, 222 (1986). The district court ruled that plaintiff Carolyn Gaskell, wife of "covered employee" David Gaskell, was entitled to three years' continuation coverage under COBRA, dating from her election of continuation coverage under an ERISA employer-sponsored group health insurance plan. The court denied a related subrogation claim brought by the Gaskells in the name of their current insurer. The district court rejected plaintiffs' requests for statutory penalties, punitive damages, and attorney fees.

## I

### BACKGROUND

David Gaskell was a longtime employee of the Harvard Cooperative Society ("Coop"), which provided Blue Cross group medical plan coverage for its employees and their families. On January 14, 1987, David went on full disability leave, during which he received full salary and benefits, including Blue Cross group plan coverage for himself and Carolyn, apparently at Coop expense. More than a year later, on February 29, 1988, still unable to work, David terminated his employment with the Coop, retroactive to January 14, 1988.

Under COBRA, an employer that sponsors a group health insurance plan must offer employees and "qualified beneficiaries," including spouses and dependent children, the opportunity to continue their health insurance coverage, at group rates but at their own expense, for at least eighteen months after the occurrence of a "qualifying event" and notice to the affected employee. *See* 29 U.S.C. § 1161–68. A "qualifying event" includes a "termination ..., or reduction of hours, of the covered employee's employment" which, "but for the continuation coverage under this part, would result in the loss of coverage of a qualified beneficiary." *Id.* at § 1163(2). In April 1988, following David's resignation, the Coop sent a COBRA notice informing him of his statutory right to continue his Blue Cross group plan coverage for eighteen months, beginning July 1, 1988. On April 26, 1988, David elected "continuation coverage" for himself and Carolyn.

Within a year, the Gaskells learned that David would become eligible for Medicare benefits beginning July 1, 1989. Although Medicare eligibility would render David ineligible for "continuation coverage" after July 1, 1989, *see id.* at § 1162(2)(D)(ii), it also would serve as a new "qualifying event," *see id.* at § 1163(4), and make *Carolyn* eligible for three years' "continuation coverage" under the Coop group plan with Blue Cross. *See id.* at § 1162(2)(A)(ii). At about the same time, however, the Gaskells learned that the Coop intended to terminate its Blue Cross group plan and adopt a self-funded insurance plan administered by Benefit Plans Northeast ("BPN"), effective July 1, 1989. As the new BPN-administered plan would not be "convertible" to individual coverage at the end of Carolyn's continuation coverage period, the Gaskells decided to exercise their "conversion option" under the Coop Blue Cross group plan. Accordingly, in June 1989, prior to the changeover in Coop plan administration, the Gaskells asked the Coop to "convert" Carolyn's group coverage, effective July 1, to individual direct-pay coverage under the Blue Cross Managed Major Medical Plan.

The coincidence of David's Medicare eligibility, Carolyn's application for conversion to an individual policy, and the Coop's change to a self-funded plan, engendered considerable confusion among the parties. On August 30, 1989, Blue Cross began returning the Gas-

* Of the Second Circuit, sitting by designation.

kells' medical bills unpaid. Blue Cross contended that its obligation to provide Carolyn with individual direct-pay coverage had terminated on June 30, 1989, concurrently with the expiration of its group plan arrangement with the Coop, and that any Blue Cross coverage beyond that date would be available only on the terms imposed on new applicants, *viz.*, a 240-day waiting period and an exclusion for preexisting medical conditions. Finding these terms unacceptable, the Gaskells sought to continue Carolyn's coverage under the Coop group plan, then being administered by BPN. BPN refused, asserting that the Coop's obligation to provide "continuation coverage" had terminated before the change in plan administration took place on July 1, 1989. After several unsuccessful efforts to obtain satisfactory coverage, the Gaskells brought the present action against the Coop, BPN, James Argeros (Coop president), Leonard Cutler (BPN president), and Blue Cross, alleging violations of COBRA and Massachusetts law.[1]

On January 31, 1991, the Gaskells settled their claims against Blue Cross, in return for, *inter alia*, individual coverage for Carolyn under the Blue Cross Managed Major Medical Plan retroactive to July 1, 1989. The retroactive coverage was subject to a twenty percent co-payment. As part of the settlement, Blue Cross assigned the Gaskells its subrogation rights against the remaining defendants. The Gaskells then amended their complaint to add a subrogation claim against the Coop and BPN, relating to the eighty percent of Carolyn's medical expenses which Blue Cross had paid under the terms of Carolyn's individual Blue Cross policy.

On May 17, 1991, acting on cross-motions for judgment on the pleadings, the district court ruled that BPN and the Coop were legally responsible under COBRA for providing "continuation coverage" of Carolyn's medical expenses between July 1, 1989 and July 1, 1991. The court rejected the Gaskells' demand for "extra-contractual" damages, and limited compensatory damages to the twenty percent co-payment amount not retroactively covered by Carolyn's individual Blue Cross policy, at the same time reserving

decision on their subrogation claim for the remaining eighty percent of Carolyn's medical expenses. *See Gaskell v. Harvard Cooperative Soc'y*, 762 F.Supp. 1539, 1543–1544 & n. 8 (D.Mass.1991). Shortly thereafter, in an unpublished order, the district court granted summary judgment against the Gaskells on their subrogation claim, ruling that Blue Cross "possessed no rights pursuant to the Subscriber Certificate against [the Coop] for reimbursement of any monies paid towards [Carolyn's] medical bills." The individual claims against Leonard Cutler, as "plan administrator," were dismissed on October 6, 1992. The parties stipulated to the dismissal of the remaining count against BPN, and final judgment was entered on December 14, 1992. This appeal followed.

## II

### *DISCUSSION*

#### *Standards of Review*

We review a grant of summary judgment *de novo*, employing the same criteria incumbent upon the district court. *See Vanhaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 3 (1st Cir.1993); *High Voltage Eng'g Corp. v. Federal Ins. Co.*, 981 F.2d 596, 598 (1st Cir.1992); *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 50 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Vanhaaren*, 989 F.2d at 3; *Canal Ins. Co. v. Benner*, 980 F.2d 23, 25 (1st Cir.1992). Similarly, on plenary review of a district court judgment on the pleadings under Rule 12(c), all material allegations in the complaint are credited in the light most favorable to the plaintiff, *see International Paper Co. v. Jay*, 928 F.2d 480, 482 (1st Cir.1991). A dismissal on the pleadings will be upheld only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claims

---

1. The Gaskells later waived their state-law claims against all defendants.

which would entitle [it] to relief.'" *Id.* at 482–83 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). .

### Statutory Background

COBRA was enacted in 1986, as a legislative response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay," H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.C.C.A.N. 42, 579, 622.[2] In "an effort to provide continued access to affordable private health insurance for some of these individuals," H.R.Rep. No. 241, at 44, 1986 U.S.C.C.A.N. at 622, without increasing the "staggering budget deficits now facing the United States," *see* S.Rep. No. 146, 99th Cong., 2nd Sess. 3, *reprinted in* 1986 U.S.C.C.A.N. 42, 43, COBRA compels employers that sponsor certain group health plans to provide "qualified beneficiaries" with the option of receiving self-paid "continuation coverage," at no more than 102% of group rates, for eighteen or thirty-six months after the occurrence of a "qualifying event" which would otherwise result in a termination of coverage. *See* 29 U.S.C. § 1161(a), 1162(2)(A).[3]

The "continuation coverage" required by COBRA must be "identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred," 29 U.S.C. § 1162(1), and "[i]f coverage is modified under the plan for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to [COBRA]...." *Id.* An employer which fails to provide elective "continuation coverage" under the terms of the statute is subject to unfavorable tax treatment, *see* 26 U.S.C. § 4980B (1989), *amending* 26 U.S.C. § 162(i)(2) (1988), and to civil suit by affected "qualified beneficiaries," *see* 29 U.S.C. § 1132(a). A plan administrator which fails to provide a "qualified beneficiary" with timely notice of her rights under COBRA is subject to personal liability not exceeding $100 per day. *See* 29 U.S.C. § 1132(c)(1); *see generally* Jeffrey D. Mamorsky, *Employee Benefits Law: ERISA and Beyond,* § 10.07 *et seq.* (2d ed. 1993) (discussing COBRA and subsequent amendments).

### The Gaskells' Coverage

The Coop does not contest its obligation, under COBRA, to provide the Gaskells with "continuation coverage," at their election and expense, for a minimum of eighteen months after the occurrence of a "qualifying event." *See* 762 F.Supp. at 1541. Instead, the Coop contends that the relevant "qualifying event" occurred on January 14, 1987, when David Gaskell first went on full disability leave, "reducing his hours" from forty per week to zero. *See* 29 U.S.C. § 1163 ("reduction of hours ... of the covered employee's employment" as potential qualifying event). On the Coop's reasoning, therefore, its eighteen-month "continuation coverage" obligation expired on July 14, 1988, and the Coop had no legal duty to continue Carolyn's coverage further based on David's subsequent Medicare eligibility on July 1, 1989. We agree with the Coop's reading of the

---

**2.** Although COBRA has been amended several times, *see, e.g.,* Tax Reform Act of 1986, P.L. 99–514 (October 22, 1986), § 1895(d); Technical and Miscellaneous Revenues Act of 1988, P.L. 100–647 (November 10, 1988), § 3011(a); and Omnibus Budget Reconciliation Act of 1989 ("OBRA"), P.L. 101–239 (December 19, 1989), §§ 6703–6710, 6801, 7862(c), 7891(d), except as otherwise indicated we refer to the January, 1987 version as "COBRA."

For a fuller description of COBRA's enactment, see Thomas H. Somers, *COBRA: An Incremental Approach to National Health Insurance,* 5 J.Contemp.Health L. & Probs. 141, 141–2 (1992) (noting that COBRA's "continuation coverage" provisions were enacted "without deliberation ..., in the process amending three distinct statutes," and "invit[ing] a fair amount of regulatory confusion.").

**3.** The period of entitlement to "continuation coverage" may be extended or shortened, depending on the occurrence of certain events within the preceding coverage term. *See, e.g.,* 29 U.S.C. § 1162(2)(A)(ii) (occurrence of additional qualifying event, within initial period of "continuation coverage," may extend term of COBRA coverage); *id.* at § 1162(2)(A)(v) (covered employee's eligibility for "continuation coverage" terminates with Medicare eligibility).

statute, but find no record evidence to support its allegation that group plan coverage terminated as a result of David's disability leave on January 14, 1987. Accordingly, we must remand for further fact finding on this issue.

Under COBRA, "the term 'qualifying event' means, with respect to any covered employee, any ... [termination or reduction in hours] *which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary....*" 29 U.S.C. § 1163 (emphasis added). As the district court noted, *see* 762 F.Supp. at 1542, this statutory language offers no explicit guidance in determining the relevant "qualifying event" where, as here, the employee's termination or reduction in hours does not coincide with the "loss of coverage" under the employer's plan. In these circumstances, the district court elected to view the "qualifying event" as "the point at which [the employee] *experience* [*d* ] *a loss of coverage* as a consequence of the reduction in hours." *Id.* at 1543 (emphasis added). Other courts, by contrast, have measured the eighteen-month period *from the event itself, viz.,* the employee's termination or reduction in hours, so long as that event "*eventually* resulted in the loss of ... health coverage." *See, e.g., Phillips v. Riverside, Inc.,* 796 F.Supp. 403, 411 (E.D.Ark. 1992) (holding that employer's "gratuitous" provision of three months' continued coverage must be credited towards employer's eighteen-month COBRA "continuation coverage" obligation once *belated* notice has been given to the employee); *see also Hubicki v. Amtrak Nat. Passenger R. Co.,* 808 F.Supp. 192, 197 (E.D.N.Y.1992) (noting, without resolving, possible alternative readings of statute).

■ Since we agree with the district court that either reading is plausible, based on the statutory language, we consult the available legislative history. *See Concrete Pipe & Prods., Inc. v. Construction Laborers Pen-sion Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2281, 124 L.Ed.2d 539 (1993) ("we turn, as ... in the usual case of textual ambiguity, to the legislative purpose as revealed by the history of the statute"); *United States v. Alky Enterprises, Inc.,* 969 F.2d 1309, 1314 (1st Cir.1992) ("where the language of a statute is ambiguous on its face, we should look ... to the legislative history in order to ascertain Congressional intent"); *see generally* Stephen J. Breyer, *On The Uses of Legislative History in Interpreting Statutes,* 65 S.Cal.L.Rev. 845 (1992) (discussing proper use of legislative history in ascertaining congressional intent where statute is ambiguous). COBRA's legislative history leads us to conclude that Congress intended an employee's eighteen-month period of continuation coverage to *commence with the event leading, under the terms of the plan, to loss of coverage,* rather than upon the loss of coverage itself.

First, while the House Reports accompanying the various versions of the statute are silent or ambiguous on the issue,[4] the "continuation coverage" provisions in the House bill were incorporated virtually without change into the final Conference bill,[5] and the Report of the Senate Finance Committee, which accompanied the final Conference version, is reasonably explicit. It provides, in pertinent part, that:

> Th[e] 18–month period [of continuation coverage] includes, and is not in addition to, any continuation period presently permitted under local law. Thus, for example, if the plan presently provides that dependent coverage ceases one month after the date of an employee's death, the bill would require that beneficiaries be entitled to elect continuation coverage for up to 18 months following the date of death, not the 18–month period beginning with the actual cessation of coverage one month after the employee's death.

---

4. *See* H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, 45, *reprinted in* 1986 U.S.C.C.A.N. 579, 622–23 (no discussion of issue); H.R.Rep. No. 300, 99th Cong., 2d Sess. 319–20, *reprinted in* 1986 U.S.C.C.A.N. 756, 970–71 (noting, without elaboration, that § 1163 "defines qualifying event").

5. *Compare* Pub.L. 99–272 §§ 10001–02 *with* H.R.Conf.Rep. No. 99–543, at 162–72 (text of H.R. 3128, §§ 10001–02 (rejected by the House, December 19, 1985)).

*See* S.Rep. No. 146, 99th Cong., 2d Sess. 3, 365, *reprinted at* 1986 U.S.C.C.A.N. 42, 324. We perceive no basis, in the legislative history, for the Gaskells' proposed distinction between "blended" coverage and "stacked" coverage.[6] Moreover, the Senate Finance Committee Report, referring to *"any* continuation period presently permitted," *see id.* (emphasis added), appears to undermine the basis for such a distinction.

Second, the Proposed Regulations issued by the Treasury Department, the only administrative interpretation of the statute proffered to date, appear to take a similar position. *See* Prop.Treas.Reg. 1.162–26, 52 Fed.Reg. 22,716 (proposed Apr. 6, 1987; to be codified at 26 C.F.R. pt. 1), at Q & A–18 ("a loss of coverage need not occur immediately after the event, so long as the loss of coverage will occur before the end of the maximum coverage period"); *see also id.* at Q & A–39 ("The end of the maximum coverage period is measured from the date of the qualifying event *even if the qualifying event does not result in a loss of coverage under the plan until some later date"*) (emphasis added).[7] The Proposed Treasury Regulations have not yet been finalized, are apparently on hold pending further revisions, *see* 56 Fed.Reg. 53803–03 (1991), and, accordingly, are *not authoritative. See Oakley v. City of Longmont,* 890 F.2d 1128, 1133 (10th Cir. 1989) (Treasury Department's interpretation of COBRA not authoritative "[u]ntil the agency completes formal rule-making and promulgates final regulations"), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *see also Sirkin v. Phillips Col-*

*leges, Inc.,* 779 F.Supp. 751, 755 (D.N.J.1991) (declining to apply proposed Treasury regulation). Nevertheless, pending promulgation of final regulations, the Internal Revenue Service has announced that it "will consider compliance with the terms of these proposed regulations to constitute good faith compliance with a reasonable interpretation of the statutory requirements." *See* 52 Fed.Reg. 22,716. Accordingly, some courts have relied on the Proposed Regulations, notwithstanding their interim status, to define the scope of employers' duties under COBRA. *See Branch v. G. Bernd Co.,* 955 F.2d 1574, 1581 (11th Cir.1992) (finding that proposed regulations "represent the proper construction of COBRA in light of Congress' intent"); *see also Lincoln Gen. Hosp. v. Blue Cross/Blue Shield of Nebraska,* 963 F.2d 1136, 1142 (8th Cir.1992) (Proposed Regulations show "regular practice" under COBRA); *Communications Workers of America v. NYNEX Corp.,* 898 F.2d 887, 888–89 (2d Cir.1990) (citing Proposed Regulations).[8]

Finally, our reading accords with the interpretation adopted by Congress in amending COBRA through the Omnibus Budget Reconciliation Act of 1989. *See* H.R. No. 101–247, 101st Cong., 1st Sess. 52 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 1944 (under the original version of the statute, "[i]f the laid-off employee ... elects continuation coverage, the maximum period of that coverage is *measured from the date of the layoff,* although the period an employer has to notify the employee that he or she has the right to elect continuation coverage does not begin to run until group health coverage is lost.")

---

**6.** As explained in the Gaskells' appellate brief, "blending" of coverage occurs when "the employer wishes to pay for the employee's coverage for part or all of the COBRA period," after giving timely notice to the employee of the occurrence of a qualifying event. "Stacking" of coverage occurs "when the employer provides coverage ... for some period after termination without complying with COBRA and then gives the notice."

**7.** In enacting COBRA, Congress delegated responsibility for the issuance of interpretive regulations to three separate agencies: the Departments of Treasury, Labor, and Health and Human Services. *See, e.g.,* 26 U.S.C. § 7801, 7805 (Secretary of Treasury authorized to "prescribe all needful rules and regulations for the enforce-

ment of this title"); 29 U.S.C. § 1168 (Secretary of Labor authorized to "prescribe regulations to carry out the [continuation coverage] provisions"). To date, only the Treasury Department has proposed regulations under the statute. *See generally Johnson v. Reserve Life Ins. Co.,* 765 F.Supp. 1478, 1480–83 (C.D.Cal.1991) (discussing regulatory overlap in COBRA provisions).

**8.** Moreover, we note that the Proposed Treasury Regulations are invoked, at various points, by both parties in their appellate briefs. *Cf. W.R. Grace & Co. v. United States E.P.A.,* 959 F.2d 360, 366 n. 14 (1st Cir.1992) (agency's interim, non-final regulations do not control appeal, but may be considered upon both parties' application "for the limited purpose of bolstering ... analysis").

(emphasis added). Although the views of a subsequent Congress obviously are not binding in determining the intent of an earlier legislature, *see, e.g., United States v. American Heart Research Fund*, 996 F.2d 7, 10 (1st Cir.1993); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 31 (1st Cir.1989), "such views are entitled to significant weight ... and particularly so when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) (citation omitted); *see also United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 758 (1st Cir. 1985); *Roosevelt Campobello Int'l Park Comm'n v. United States E.P.A.*, 711 F.2d 431, 436–37 (1st Cir.1983). As the accretion of evidence is compelling, we conclude that the Gaskells' eighteen-month "continuation coverage" period ran from the date of the event which triggered David's loss of benefits under the terms of the Coop's group insurance plan, and not from July 1, 1988, when the Coop ceased its voluntary provision of employer-paid group plan insurance and the Gaskells' self-paid "continuation coverage" commenced.[9]

■ An important issue remains: whether, under the terms of the Coop's group insurance plan, David's loss of group plan eligibility inexorably was triggered by the commencement of his disability leave (January 14, 1987), by his resignation (January 14, 1988), or by some other event. It is the terms of the plan that matter in defining the appropriate "trigger"; thus, David's reduction in hours is not a "qualifying event" if it is not so designated in the plan, even if it *might have been* designated as such, and regardless of the fact that it may ultimately have *led to* the eventual occurrence of a "qualifying event" which was so designated. *See, e.g., Jachim v. KUTV, Inc.*, 783 F.Supp. 1328, 1332 (D.Utah 1992) (rejecting employee's claim that "reduction in hours" was a "qualifying event," where plan provided no cessation of coverage until employee's actual termination).

The record does not contain a copy of the Blue Cross group insurance plan; and, with respect to the "triggering event" which led to cessation of plan coverage, the district court concluded that "there [was] no evidence concerning the Coop's policy with regard to the provision of benefits to employees on disability leave," *see* 762 F.Supp. at 1541 n. 4. Since we may uphold the judgment on the pleadings only if "it appears beyond doubt that the plaintiff can prove *no set of facts* in support of [its] claims which would entitle [it] to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (emphasis added), and it is impossible to determine from the present record whether going on full disability leave would automatically "trigger" a cessation of David's contractual entitlement to employer-paid group plan insurance benefits, *cf. Charles v. Des Plaines Pub. Co., Inc.*, No. 91–C–01288, 1991 WL 105581, *2 (N.D.Ill. June 4, 1991), U.S.Dist. LEXIS 7806, *5 (noting employee's failure to allege facts showing *entitlement* to group insurance during disability leave), the district court

---

9. We acknowledge the potential harsh effects of our interpretation, which effectively shifts to "qualified beneficiaries" the responsibility to ascertain when a "qualifying event" has occurred which would eventuate in the inexorable loss of a contract-right to coverage under the employer's plan—even if that event precedes by days or months the *actual* loss of plan coverage, the provision of notice by the plan administrator, and the commencement of any unexpired "election" period. *See* 29 U.S.C. § 1165(1)(A) ("election period ... begins not later than the date on which coverage terminates"). For example, if a "qualified beneficiary" of a plan which offers no conversion option fails to recognize the covered employee's reduction in hours as a "qualifying event," and no notice is provided by the plan administrator, the qualified beneficiary may find her continuation coverage abruptly terminated, some months later, with little or no time to arrange for alternative insurance. The Gaskells argue, with considerable force, that this result is inconsistent with COBRA's general remedial purpose, *see National Companies Health Ben. Plan v. St. Joseph's Hosp., Inc.*, 929 F.2d 1558, 1572–73 (11th Cir.1991), to avoid sudden losses in coverage. However, in the ordinary case, this sequence of events will be forestalled by the plan administrator's provision of timely notice under 29 U.S.C. § 1166(a) ("In accordance with regulations prescribed by the Secretary.... (4) the administrator shall notify ... any qualified beneficiary with respect to [a qualifying] event ... of such beneficiary's rights under this subsection"). Penalties may be enforced against plan administrators who fail to provide such notice. *See id.* at § 1132(c)(1).

judgment was at least premature.[10] We accordingly vacate the judgment, and remand for further proceedings.

Since the remaining arguments raised by the Gaskells on appeal turn on the terms of the plan contract, and the validity of the district court's finding that "the Coop was ... obligated [under the terms of the contract] to provide health plan coverage to the Gaskells for a period beginning July 1, 1988," see 762 F.Supp. at 1543, appellate resolution of these issues must await evidence of the terms of the plan contract, and district court reconsideration of the Coop's COBRA liability, on remand. We accordingly vacate the judgment, and remand for further proceedings.

*The district court judgment is vacated and the case is remanded for further proceedings consistent herewith.*

---

**10.** For similar reasons, we decline to rule on the Gaskells' alternate argument, that principles of equitable estoppel require the Coop to provide "continuation coverage" under its plan for eighteen months beyond July 1, 1988. Even assuming that the defense of equitable estoppel is available to COBRA beneficiaries, upon a proper showing, where the terms of a plan are otherwise ambiguous, see *National Companies Health Plan,* 929 F.2d at 1572-73, a preliminary showing of ambiguity is required; "'estoppel may not be invoked to enlarge or extend the coverage specified in a contract.'" *See id.* at 1572 n. 13 (*quoting Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285 n. 3 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990)). Since the Blue Cross group plan contract with the Coop is not part of the record, we cannot determine whether the ambiguity showing can be met here.