USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 93-1766 IN RE: UNITED STATES OF AMERICA, EX REL. S. PRAWER AND COMPANY, ET AL., Plaintiffs, Appellants, v. FLEET BANK OF MAINE, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Stahl, Circuit Judges. ______________ ____________________ Jeffrey Bennett with whom Melinda J. Caterine and Herbert H. ________________ ____________________ __________ Bennett & Assoc., P.A. were on brief for appellants. ______________________ James E. Kaplan with whom Derek P. Langhauser, James E. Kaplan & _______________ ___________________ __________________ Associates, P.A. and Julianne Cloutier were on brief for appellee Amy _________________ _________________ Bierbaum. Thomas N. O'Connor with whom Donald L. Cabell and Hale and Dorr ___________________ _________________ _____________ were on brief for appellees Verrill & Dana, P. Benjamin Zuckerman and Anne M. Dufour. Joseph F. Shea with whom Paul R. Gupta and Nutter, McClennen & ______________ ______________ ____________________ Fish were on brief for appellee RECOLL Management Corporation. ____ John J. Wall, III with whom Thomas F. Monaghan and Monaghan, ___________________ ___________________ _________ Leahy, Hochadel & Libby were on brief for appellee Fleet Bank of _________________________ Maine. Frank W. Hunger, Assistant Attorney General, Jay P. McCloskey, ________________ _________________ United States Attorney, and Douglas N. Letter and Jonathan R. Siegel, _________________ __________________ Attorneys, Civil Division, Department of Justice, on brief for the United States, amicus curiae. ____________________ May 5, 1994 ____________________ STAHL, Circuit Judge. This appeal arises out of STAHL, Circuit Judge. ______________ the district court's sua sponte dismissal of a qui tam action ___ ______ ___ ___ brought by plaintiffs-appellants S. Prawer & Company, Gilbert Prawer, and Harvey Prawer (collectively "Prawer") as relators under the False Claims Act ("FCA"), 31 U.S.C. 3729 et __ seq.1 Plaintiffs primarily2 contend that the court erred ____ in concluding that 31 U.S.C. 3730(e)(3),3 a provision enacted as part of the 1986 amendments to the qui tam ___ ___ provisions of the FCA, bars their claim. The issue is one of first impression, as no other court has as yet been called upon to interpret the reach and meaning of this ambiguous ____________________ 1. Because of the length of the statutory provisions relevant to this appeal, we have attached them in an appendix to our opinion. 2. Employing an extremely literal reading of 31 U.S.C. 3730(b)(1) (an action brought under the FCA "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting"), plaintiffs also argue that the court erred in proceeding sua ___ sponte and dismissing this action without the approval of the ______ Attorney General. Because, as will be discussed infra, we _____ believe the court erred in determining that this action was jurisdictionally barred, we need not and do not address the merits of this somewhat dubious assertion. See Fed. R. Civ. ___ P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the __ _________ subject matter, the court shall dismiss the action.") _____ (emphasis added). 3. Section 3730(e)(3) states: "In no event may a person bring [a qui tam action] which is based upon allegations or ___ ___ transactions which are the subject of a civil suit or an administrative money penalty proceeding in which the government is already a party." -2- 2 provision. After careful consideration of the arguments presented, we reverse. I. I. __ BACKGROUND BACKGROUND __________ A. Relevant Factual and Procedural History A. Relevant Factual and Procedural History ___________________________________________ The relevant facts and allegations, recounted in the light most favorable to plaintiffs, are as follows.4 In January 1991, the Maine National Bank ("MNB") was declared insolvent and the Federal Deposit Insurance Corporation ("FDIC") was appointed its receiver. The New Maine National Bank ("NMNB") was established as a bridge bank through which the FDIC would conduct certain MNB-related affairs. On or about July 12, 1991, the NMNB closed, and the FDIC sold virtually all of its assets to Fleet Bank of Maine ("Fleet"). The contract by which this transfer of assets was effectuated is known as the "Assistance Agreement." Inter _____ alia, the Assistance Agreement provided that Fleet had the ____ right to "put," or cause the FDIC to repurchase, any NMNB loans acquired by it pursuant to the Assistance Agreement ____________________ 4. A few of the following facts and allegations appear only in plaintiffs' brief. Because they help shed light on the convoluted factual underpinnings of this litigation and have no effect on our resolution of the question before us, we have included them in our recitation of the case's background. Our inclusion of these facts and allegations should not, however, be construed either as an endorsement of their veracity or as an indication that they are well- pleaded. -3- 3 (provided that said loans did not fall into any one of several exceptional categories described in the Assistance Agreement). Included among the transferred assets were five promissory notes, totalling approximately $1.1 million, given by Prawer to the NMNB. The notes represented the amount Prawer had drawn against a $2 million line of credit extended to it by NMNB. On July 15, 1991, Prawer entered into a new agreement with Fleet for an unsecured line of credit (known as the "Fleet Credit Facility") which permitted it to draw up to $2 million by executing and/or renewing consecutive, unsecured 90-day term notes on a note-by-note basis. Prawer utilized this new line of credit from Fleet to satisfy fully its obligations under each of the five outstanding NMNB notes. By May 5, 1992, Prawer had drawn $1.6 million against its $2 million line of credit under the Fleet Credit Facility. These borrowings were evidenced by seven unsecured 90-day term notes. Meanwhile, on April 30, 1992, Prawer sold virtually all of its then-existing assets to C&S Wholesale Grocers, Inc. ("C&S"). Gilbert Prawer informed Fleet of the sale on May 1, 1992. On May 6, 1992, pursuant to the Assistance Agreement, Fleet put certain Prawer notes back to the FDIC. -4- 4 The parties hotly contest, however, whether any of the notes were "putable" under the terms of the Assistance Agreement.5 1. The Collection Case 1. The Collection Case Subsequently, in November 1992, the FDIC commenced an action against Prawer, C&S, and a number of individual defendants to collect upon the notes put back to it pursuant to the Assistance Agreement. The complaint in that action not only sought enforcement of the notes, but also alleged that the April 30, 1992, sale of Prawer's assets to C&S constituted a fraudulent conveyance and violated Maine's Bulk Sale Act. More specifically, the FDIC contended that Prawer had become insolvent, and had peddled its assets for less than full value in order to satisfy its debts to certain creditors. Accordingly, the complaint sought damages beyond the amount allegedly outstanding on the notes. Prawer responded to this complaint with several affirmative defenses and counterclaims, as well as filing a third-party complaint against Fleet and Recoll Management Corporation ("Recoll"), a Fleet subsidiary which had, pursuant to an agreement with the FDIC, been seeking to ____________________ 5. It has been and is plaintiffs' position that none of the ____ notes were properly putable; defendants apparently now concede that some of the notes were not putable because ____ plaintiffs' obligations thereunder had been fully satisfied, but argue that certain other notes were, in fact, putable. -5- 5 collect upon the notes which were put back to the FDIC. A variety of charges were made in these defenses, counterclaims, and third-party claims; among these was an assertion that the notes were not putable to the FDIC pursuant to the Assistance Agreement. But see infra note 6. ___ ___ _____ At oral argument, the parties represented that, since the filing ofthis case, the Collection casehas settled. 2. The Qui Tam Case 2. The Qui Tam Case ___ ___ On June 21, 1993, plaintiffs filed the instant qui ___ tam action. In their complaint, plaintiffs contended that ___ the named defendants -- Fleet, Recoll, Verrill & Dana (the law firm that served as legal counsel to Fleet, Recoll, and the FDIC at all times relevant to this matter), P. Benjamin Zuckerman and Anne M. Dufour (the Verrill & Dana lawyers involved in this matter), and Amy Bierbaum (an FDIC staff attorney) -- "created and used, or caused to be created and used, false records and statements designed to defraud the Government into paying Fleet approximately $1.6 million" for the Prawer notes pursuant to the put-back provisions of the Assistance Agreement. Nine days later, on June 30, 1993, the district court sua sponte dismissed plaintiffs' complaint. In so ___ ______ doing, the court relied upon 3730(e)(3), see supra note 3, ___ _____ finding that (1) the allegations made and transactions implicated in plaintiffs' complaint already were at issue (as -6- 6 defenses) in the Collection case; and (2) the "government," in the person of the FDIC, was a party to that action. See ___ United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, _____________________________________ ___________________ 825 F. Supp. 339 (D. Me. 1993). Plaintiffs moved the court to reconsider its sua ___ sponte order of dismissal, arguing, inter alia, that (1) the ______ _____ ____ "government," for purposes of 3730(e)(3), was not a party to the Collection case; and (2) the qui tam action was not ___ ___ "based upon allegations or transactions which are the subject of" the Collection case. In a comprehensive memorandum of decision, the court rejected both of these arguments (as well as all other arguments made in plaintiffs' motion). In so doing, however, the court receded slightly from its original holding on the question of whether there was an identity between the allegations and transactions which were "the subject of" the Collection case and those that served as the basis for the qui tam action. Instead, the court found: ___ ___ To the extent that defenses based upon the allegations of the qui tam ___ ___ complaint are not pleaded in the related civil action, that is entirely the result of the conscious decision of counsel for the defendants there (and Plaintiffs here) to abjure their pleading. Clearly the factual predicate for the false claims alleged in the qui tam action form ___ ___ the basis for assertion of viable defenses to the claims made against the defendant S. Prawer & Company on the notes in the related civil action. An effective defense to those claims would require that those defenses be pleaded there if counsel, in good faith, believe -7- 7 the facts put forth here. . . . This Court believes that the proper construction of [ 3730(e)(3)] requires that it be read broadly enough to encompass not only allegations and transactions actually put in issue by the litigants in the related civil suit but any allegations or transactions that could legitimately be made a subject (e.g., [sic] be put in issue) of that ____ suit in the regular course of its development. United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, _____________________________________ ___________________ Civ. No. 93-165-P-C, slip op. at 3-4 (D. Me. July 12, 1993) (footnote omitted).6 Accordingly, the court denied plaintiffs' motion. Id. at 9. ___ B. The Statutory Framework B. The Statutory Framework ___________________________ Because our resolution of the issue presented in this appeal necessarily is informed by Congress's intent in enacting the 1986 amendments to the FCA's qui tam provisions, ___ ___ a brief historical overview of the statute is in order. The FCA's qui tam7 provisions, see generally 31 U.S.C. ___ ___ ___ _________ ____________________ 6. Our review of the pleadings in the Collection case reveals that it is a close question as to whether the illegitimacy of the put (on grounds of fraud) actually was raised therein as an affirmative defense. However, because __ __ ___________ _______ we find that 3730(e)(3) does not bar this action even if the fraud claim was so raised, we will assume this fact arguendo and will not address the district court's ruling ________ that the statute also bars qui tam actions based upon ___ ___ allegations or transactions that could have been raised in _____ ____ another civil action or administrative money penalty proceeding. 7. "Qui tam" is an abbreviation for "qui tam pro domino rege ___ ___ ___ ___ ___ ______ ____ quam pro seipso," which literally means "he who as much for ____ ___ ______ the king as for himself." United States ex rel. Springfield _________________________________ Terminal Ry. Co. v. Quinn, 14 F.3d 645, 647 n.1 (D.C. Cir. ________________ _____ -8- 8 3730(b)-(g), empower private persons, known as "relators," (1) to sue, on behalf of the government, persons who knowingly have presented the government with false or _________ fraudulent claims (as the highlighted terms are defined by 31 ______ U.S.C. 3729); and (2) to share in any proceeds ultimately recovered as a result of such suits, see generally 31 U.S.C. ___ _________ 3730(d). Since its enactment in 1863,8 the FCA has contained several different qui tam provisions. The original ___ ___ provisions contained no significant jurisdictional limitations and did not preclude plaintiffs from bringing suit on the basis of information already in the government's possession. Quinn, 14 F.3d at 649. Despite this invitation _____ for abuse, however, the provisions were used sparingly in the first fifty years of their existence. Id. (citing United ___ ______ States ex rel. LaValley v. First Nat'l Bank of Boston, 707 F. _______________________ __________________________ Supp. 1351, 1354 (D. Mass. 1988)). During the New Deal and World War II, there was a notable increase in the number of contracts awarded by the ____________________ 1994) (citing John T. Boese, Civil False Claims and Qui Tam _______________________________ Actions, 1-6 (1993)). Qui tam provisions, which historically _______ ___ ___ have allowed parties to initiate suit on the government's behalf and to share in the recovery as bounty, first gained popularity in thirteenth-century England as a supplement to ineffective law enforcement. Id. (citing Note, The History ___ ___________ and Development of Qui Tam, 1972 Wash. U. L.Q. 81, 86-87 and ___________________________ Boese, supra, at 1-6). _____ 8. The FCA originally was enacted "in order to combat rampant fraud in Civil War defense contracts." See S. Rep. ___ No. 345, 99th Cong., 2d Sess. 8, reprinted in 1986 _________ __ U.S.C.C.A.N. 5266, 5273. -9- 9 government to private individuals and entities. Id. Along ___ with this increase came a concomitant surge in the number of qui tam actions brought by relators under the FCA. See id. ___ ___ ___ ___ This litigational surge, in turn, brought to the fore the fact that the qui tam provisions then in effect were too ___ ___ susceptible to abuse by "parasitic" relators. The era of parasitic qui tam actions reached its apex in United States ___ ___ _____________ ex rel. Marcus v. Hess, 317 U.S. 537 (1943), where the _______________ ____ Supreme Court allowed a relator to proceed with a qui tam ___ ___ suit that was based solely on the allegations of a criminal ______ indictment to which defendants already had pleaded nolo ____ contendere (and as a result of which defendants already had __________ paid fines totalling $54,000). See Quinn, 14 F.3d at 649-50; ___ _____ see also S. Rep. No. 562, 99th Cong., 2d Sess. 10, reprinted ___ ____ _________ in 1986 U.S.C.C.A.N. at 5275. In rejecting the government's __ argument that permitting the action to proceed would thwart the spirit of the FCA, the Court stated: Even if . . . petitioner has contributed nothing to the discovery of this crime, he has contributed much to accomplishing one of the purposes for which the [FCA] was passed. The suit results in a net recovery to the government of $150,000, three times as much as fines imposed in the criminal proceedings. Hess, 317 U.S. at 545. Accordingly, because the Court found ____ neither a bar to the suit in the text of the FCA nor an intent to impose one in the Act's legislative history, id. at ___ -10- 10 546, it declined to establish a judicial bar on its own initiative, Quinn, 14 F.3d at 650. _____ In response to public outcry over the Hess ____ decision, Congress acted quickly to restrict the universe of litigants who could avail themselves of the FCA's qui tam ___ ___ provisions. Id. at 650. The 1943 amendments to these ___ provisions, signed into law by President Roosevelt on December 21, 1943, codified this restriction. See S. Rep. ___ No. 562, 99th Cong., 2d Sess. 12, reprinted in 1986 _________ __ U.S.C.C.A.N. at 5277. The amendments reflected compromise between the House and Senate; the House bill would have repealed the qui tam provisions altogether, while the Senate ___ ___ bill would have precluded suits which were based upon information already in the government's possession unless the information underlying the suit was "original with [the] person [bringing the suit]." Quinn, 14 F.3d at 650 (quoting _____ 89 Cong. Rec. 510, 744 (daily ed. December 16, 1943)); see ___ also S. Rep. No. 562, 99th Cong., 2d Sess. 11-12, reprinted ____ _________ in 1986 U.S.C.C.A.N. at 5276-77. Although the Senate's __ approach largely prevailed, the provision of the Senate bill expressly permitting the "original source" of information to bring a qui tam action was dropped in conference. See S. ___ ___ ___ Rep. No. 562, 99th Cong., 2d Sess. 12, reprinted in 1986 _________ __ U.S.C.C.A.N. at 5277. As a result, the final 1943 legislation precluded all qui tam actions "based on evidence ___ ___ -11- 11 or information the Government had when the action was brought." 31 U.S.C. 3730(b)(4) (1982) (superseded); see ___ also Quinn, 14 F.3d at 650. ____ _____ Over the next four decades, courts strictly construed the jurisdictional bar established in the 1943 amendments. See S. Rep. No. 562, 99th Cong., 2d Sess. 12, ___ reprinted in 1986 U.S.C.C.A.N. at 5277. Unsurprisingly, _________ __ there was a corresponding decrease in the use of the qui tam ___ ___ provisions to enforce the FCA during this same period. Quinn, 14 F.3d at 650 (citing Boese, supra note 7, at 1-12). _____ _____ If the Hess decision marks the highpoint of the regime of ____ liberal litigation under the qui tam provisions, the Seventh ___ ___ Circuit's decision in United States, ex rel. State of ____________________________________ Wisconsin v. Dean, 729 F.2d 1100 (7th Cir. 1984), may well _________ ____ mark the point of greatest retreat from Hess. See Quinn, 14 ____ ___ _____ F. 3d at 650. In Dean, the Seventh Circuit was faced with the ____ question of whether the State of Wisconsin should be allowed to act as a qui tam relator in a Medicaid fraud action where ___ ___ the State, in accordance with federal regulations, had already reported the fraud to the federal government. See ___ Dean, 729 F.2d at 1102-04. It was undisputed that (1) the ____ fraud investigation had been conducted by the State; (2) the State was an original source of the information provided; and (3) the State had been required to report the fraud. See id. ___ ___ -12- 12 at 1102-03 and n.2. Nonetheless, noting the unambiguous language of the FCA, the disappearance of the original source provision from the 1943 Senate bill, and the absence of any basis for finding an exception to the statutory bar where the relator was required to report the information, the court rejected the contentions of both the State and the federal government, which had filed an amicus brief on behalf of the ______ State, that the FCA's legislative history evinced a "`clearly expressed legislative intention'" to allow the action to go forward. See id. at 1104-05 (quoting Consumer Product Safety ___ ___ _______________________ Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)). ______ ___________________ Accordingly, it reversed the decision of the district court, which had found such an intention. See id. at 1104-06. ___ ___ In the wake of the Seventh Circuit's opinion in Dean, there was once again a perception that the qui tam ____ ___ ___ provisions were in need of alteration. See S. Rep. No. 562, ___ 99th Cong., 2d Sess. 13, reprinted in 1986 U.S.C.C.A.N. at _________ __ 5278 (recounting that the National Association of Attorneys General adopted a resolution calling on Congress to rectify "the unfortunate result" of the Dean decision). Ultimately, ____ Congress responded with the False Claims Amendments Act of 1986, the stated purpose of which was "`to enhance the Government's ability to recover losses sustained as a result of fraud against the Government.'" Quinn, 14 F.3d at 650 _____ (quoting S. Rep. No. 562, 99th Cong., 2d Sess. 1, reprinted _________ -13- 13 in 1986 U.S.C.C.A.N. at 5266). Concerned that sophisticated __ and widespread fraud was depleting the national fisc, the drafters of the 1986 amendments concluded that "`only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds. Accordingly, the Senate bill increases incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government.'" Id. at 650-51 (quoting S. Rep. ___ No. 562, 99th Cong., 2d Sess. 1-2, reprinted in 1986 _________ __ U.S.C.C.A.N. at 5266-67). The 1986 amendments changed the FCA's qui tam ___ ___ provisions in several respects. On the one hand, they contained several provisions designed to "encourage more private enforcement suits." See id. at 651 (quoting S. Rep. ___ ___ No. 562, 99th Cong., 2d Sess. 23-24, reprinted in 1986 _________ __ U.S.C.C.A.N. at 5288-89). Among these are the original source provision eliminated from the 1943 Senate bill, a provision increasing monetary awards, a lower burden of proof, and a provision allowing qui tam plaintiffs to ___ ___ continue to participate in the actions after intervention by the government. Id. (citing United States ex rel. Stinson, ___ _______________________________ Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 ________________________________ ___________________ F.2d 1149, 1154 (3d. Cir. 1991)). On the other hand, Congress also enacted new provisions designed, inter alia, to _____ ____ continue the prohibition against strictly parasitic lawsuits. -14- 14 See generally 31 U.S.C. 3730(e); see also Quinn, 14 F.3d at ___ _________ ___ ____ _____ 651. We think Judge Wald summarized rather well the objectives of the 1986 amendments: The history of the FCA qui tam ___ ___ provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior. The 1986 amendments inevitably reflect the long process of trial and error that engendered them. They must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own. Id. ___ -15- 15 II. II. ___ DISCUSSION DISCUSSION __________ A. The Jurisdictional Question A. The Jurisdictional Question _______________________________ As they did before the district court, plaintiffs here argue that (1) the FDIC is not, for purposes of 3730(e)(3), "the government"; and (2) the instant action is not "based upon allegations or transactions which are the subject of" the Collection case. See supra note 3. Because ___ _____ we believe that the second of these two contentions is ultimately persuasive, and that the statutory bar of 3730(e)(3) therefore does not apply, we turn our sights to this provision of the statute. We start by noting the obvious: the breadth with which we should read the phrase "allegations or transactions which are the subject of a civil suit" is not readily ___ _______ __ apparent from the text of the statute. Defendants' argument that, because plaintiffs denied the legitimacy of the put transaction (alleging fraud) in the Collection case, there is an identity between the allegations and transactions which were at least a "subject of" that case and the fraud allegations which serve as "the basis" of this case certainly strikes us as being anchored upon a plausible construction of the phrase "the subject of" in 3730(e)(3). So too, however, does plaintiffs' argument that, when viewed at an appropriate level of specificity, the transactions and -16- 16 allegations which are "the subject of" the Collection case ___ should and must be seen only as Prawer's (1) making of the sued-upon notes, and (2) alleged failure to satisfy them. Therefore, we regard the statute as ambiguous. When faced with a facially ambiguous statutory provision, we look to the statute as a whole and the history of its enactment in order to glean congressional intent. See, e.g., Concrete Pipe & Prods., Inc. v. Construction ___ ____ _______________________________ ____________ Laborers Pension Trust, 113 S. Ct. 2264, 2281 (1993); Gaskell ______________________ _______ v. Harvard Coop. Soc'y, 3 F.3d 495, 499 (1st Cir. 1993); ____________________ United States v. Alky Enters., Inc., 969 F.2d 1309, 1314 (1st _____________ __________________ Cir. 1992). Here, we think the rather easily-discerned purposes underlying the 1986 amendments militate strongly in favor of plaintiffs' reading of the phrase. As Judge Wald observed in the Quinn decision (and _____ as we have noted above, see supra at 14-15), "[t]he history ___ _____ of the FCA qui tam provisions demonstrates repeated ___ ___ congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior," Quinn, 14 F.3d at 651. Clearly, the 1986 amendments, insofar _____ as they were responding to a regime in which the preclusion of opportunistic litigation was too heavily weighted, had as perhaps their central purpose an expansion of opportunities and incentives for private citizens with knowledge of fraud against the government to come forward with that information. -17- 17 See S. Rep. No. 562, 99th Cong., 2d Sess. 1, reprinted in ___ _________ __ 1986 U.S.C.C.A.N. at 5266 ("The purpose of [the 1986 amendments] is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government."); id. at 1-2, reprinted in 1986 U.S.C.C.A.N. at ___ _________ __ 5266-67 ("The proposed legislation seeks not only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward."); id. at 2, reprinted in ___ _________ __ 1986 U.S.C.C.A.N. at 5267 ("[The 1986 amendments] increase[] incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government."). Indeed, it is apparent that a primary objective of the 1986 amendments, as revealed in the above-quoted Senate Report and in published hearings on the proposed legislation, was to encourage and provide incentives for the bringing of qui tam actions in all ___ ___ ___ but the several circumstances delineated in 3730(e). See ___ ___ generally id. at 1-17, reprinted in 1986 U.S.C.C.A.N. at _________ ___ _________ __ 5266-82; see also generally False Claims Reform Act: Hearing ___ ____ _________ _________________________________ Before the Subcomm. on Admin. Practice and Proc. of the _____________________________________________________________ Senate Comm. on the Judiciary, 99th Cong., 1st Sess. (Sept. ______________________________ 17, 1985); False Claims Act Amendments: Hearings Before the __________________________________________________ Subcomm. on Admin. Law and Governmental Relations of the _____________________________________________________________ Comm. on the Judiciary House of Representatives, 99th Cong., ________________________________________________ 2d Sess. (February 5 and 6, 1986). -18- 18 Obviously, then, the question becomes: What circumstances does 3730(e)(3) seek to avoid? It seems clear that the answer to this question is circumstances involving "parasitic" qui tam actions which are not otherwise ___ ___ barred by 3730(e). Cf., e.g., Quinn, 14 F.3d at 651 ___ ____ _____ (interpreting the 1986 amendments as "still another congressional effort to reconcile avoidance of parasitism and encouragement of legitimate citizen enforcement actions"). Thus, when it is not clear whether or not a qui tam action ___ ___ should be barred by the ambiguous provision precluding the action if it is "based upon transactions or allegations which are the subject of" another suit or proceeding in which the government is a party, we think that a court should look first to whether the two cases can properly be viewed as having the qualities of a host/parasite relationship. In answering this question, we think it would be useful for the court to be guided by the definition of the word "parasite," and ask whether the qui tam case is receiving "support, ___ ___ advantage, or the like" from the "host" case (in which the government is a party) "without giving any useful or proper return" to the government (or at least having the potential to do so). See Random House Dictionary of the English ___ __________________________________________ Language 1409 (2d ed. unabridged 1987). If this question is ________ answered in the affirmative, the court may properly conclude that there is an identity between "the basis" of the qui tam ___ ___ -19- 19 action and "the subject of" the other suit or proceeding; if this question is answered in the negative, the court similarly may gather that such an identity is lacking. Of course, because Congress's intuition as to what constitutes "potential useful and proper return" to the government clearly changed with the enactment of the 1986 amendments, our endorsement of this inquiry would beg the question entirely without two further points. While the question of what now constitutes potential useful or proper return to the government will not always be easily answered and must necessarily be addressed on a case-by-case basis, we believe it important to note that one of the most important perceptions precipitating the 1986 amendments was that actions which had the potential of providing such return were being precluded by the then-existing statutory regime. In light of this, we feel courts should proceed with caution before applying the statutory bar of 3730(e)(3) in ambiguous circumstances. On the other hand, we think it clear that a qui tam ___ ___ suit's potential for adding funds to the government's coffers, without more, should not be regarded as constituting _______ ____ useful or proper return to the government. In enacting the 1943 amendments to the FCA's qui tam provisions, Congress ___ ___ clearly rejected the view (espoused in Hess, 317 U.S. at 545) ____ that this potentiality alone was sufficient to render non- _____ -20- 20 parasitic (and therefore viable) a qui tam action which is ___ ___ completely derivative of another case in which the government __________ is a party. And, while the 1986 amendments certainly reveal an intent to recharacterize as "non-parasitic" actions which would have been considered "parasitic" under the 1943-1986 regime (which regarded as "parasitic" all qui tam actions ___ ___ ___ based upon evidence or information the government had when the action was brought), nothing in these amendments suggests a congressional desire to return to the 1863-1943, pre-Hess ____ regime. Turning to the instant appeal, we think that two facts combine to compel the conclusion that this case has the potential of providing "useful or proper return" to the government, and therefore is not "parasitic" of the Collection case. First, the FDIC (which we shall assume arguendo to be "the government" within the meaning of ________ 3730(e)(3)) was not proceeding against the defendants to this ___ action, for fraud or otherwise, in the Collection case.9 Therefore, because this case is seeking to remedy fraud that the government has not yet attempted to remedy, it is, as a threshold matter, wholly unlike the one the drafters of 3730(e)(3) almost certainly had in mind and sought to ____________________ 9. Of the defendants named here, only Fleet and Recoll were parties to the Collection case. Moreover, Fleet and Recoll were only parties to that case because Prawer had filed a ______ series of third-party claims against them. -21- 21 preclude (i.e., a qui tam action based upon allegations or ___ ___ transactions pleaded by the government in an attempt to __ ___ __________ recover for fraud committed against it). Second, it does not appear that the FDIC could have _____ ____ sued Fleet for fraud as part of the Collection case as that __ ____ case was constituted. Had it attempted to do so, the FDIC ____ ___ ___________ not only would have been asserting, as a plaintiff, both the validity and the invalidity of the sued-upon notes against separate defendants in the same lawsuit, but it also seemingly would have been claiming under an entirely different "transaction or occurrence" (i.e., the put-back of the notes pursuant to the Assistance Agreement) than the one (Prawer's making of the notes and alleged failure to satisfy them) which was the subject matter of the Collection case. This scenario is not, of course, allowed under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 14(a) ("The ___ plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that ____ is the subject matter of the plaintiff's claim against the __ ___ _______ ______ __ ___ ___________ _____ _______ ___ third-party plaintiff . . . .") (emphasis supplied); see also ___________ _________ ___ ____ C. Wright, A. Miller, and M. Kane, Federal Practice and _____________________ Procedure, 1459 at 449 n.4 (1990) ("Plaintiff cannot in _________ effect substitute, as against the third-party defendant, another cause of action for that originally commenced by -22- 22 him.") (citing Welder v. Washington Temperance Ass'n, 16 ______ _____________________________ F.R.D. 18, 20 (D. Minn. 1954)). Another way to look at this question is to determine whether defendants' construction of this ambiguous statutory provision would further the purposes underlying the 1986 amendments. At oral argument, when pressed on this point, defendants' attorneys acknowledged that their position necessarily was predicated upon the view that qui tam actions ___ ___ were to be avoided once the government had notice of the transactions or allegations giving rise to the actions.10 However, such a view must be rejected for two reasons: (1) Congress has explicitly deemed a "notice" regime insufficient to protect the government against false claims (indeed, it was precisely such a regime that Congress sought to abandon _________ ____ _ ______ in enacting the 1986 amendments); and (2) Congress, when it wants to establish a notice regime, knows how to do so in far less ambiguous terms than those utilized in 3730(e)(3), see ___ 31 U.S.C. 3730(e)(2)(A) (precluding qui tam actions brought ___ ___ against members of Congress, members of the judiciary, or senior executive branch officials "if the action is based upon evidence or information known to the Government when the action was brought"); 31 U.S.C. 3730(b)(4) (1982) ____________________ 10. After all, given the facts noted in the preceding two paragraphs, the most defendants here can argue is that the government was, in the Collection case, provided with notice of the allegedly fraudulent nature of put-back transaction. -23- 23 (superseded) (precluding all qui tam actions "based on ___ ___ evidence or information the Government had when the action was brought"). To sum up, the instant qui tam action has the ___ ___ potential for providing "useful or proper return" to the government in at least two significant ways: (1) it seeks recovery from alleged defrauders of the government for fraud that has not yet been the subject of a claim by the government; and (2) it has the potential to restore money to the public fisc that would not and could not have been restored in the Collection case. As such, we do not think that it can be characterized as "parasitic." Therefore, we believe that it would undermine the purposes of the 1986 amendments to construe this action as being "based upon allegations or transactions which are the subject of" the Collection case. B. Other Matters B. Other Matters _________________ We recognize that defendants have made several alternative arguments for affirmance in their respective briefs. We also recognize that plaintiffs have moved to dismiss Fleet and Recoll from this action. Given the nascent state of this litigation (and all that this implies -- including an undeveloped record, an inadequate period of time for plaintiffs to have cured any defects in their pleadings, and the lack of a full opportunity for the government to have -24- 24 reviewed the pleadings, see 31 U.S.C. 3730(b)), however, we ___ decline either to delve into defendants' other arguments or to grant plaintiffs' motion to dismiss at this time. Instead, we leave these matters for the district court to decide after the government determines whether or not it will _____ intervene. So too do we leave to the district court all requests for costs arising out of claims that this action is frivolous and has been undertaken in bad faith. To the extent that any such request may be predicated on an argument that this appeal was frivolous, it is rejected. III. III. ____ CONCLUSION CONCLUSION __________ For the reasons explained above, we do not think that the instant qui tam action "is based upon allegations or ___ ___ transactions which are the subject of" the Collection case. Accordingly, the district court erred in dismissing sua ___ sponte plaintiffs' complaint on the basis of 31 U.S.C. ______ 3730(e)(3). The judgment of the district court therefore is vacated. Vacated and remanded. No costs. Vacated and remanded. No costs. ________________________________ -25- 25