**LUTHERAN HOSPITAL OF INDIANA, INC., Mary Lou Isch, and William A. Isch, Plaintiff,**

v.

**BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, Teamsters Local 135 Welfare Fund, Acordia Local Government Benefits, Inc., Associated Insurance Companies, Inc., d/b/a Blue Cross/Blue Shield of Indiana and Community and Family Service, Inc., Defendants.**

No. 1:92–CV–153.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

June 20, 1994.

Thomas J. Galanis, James A. Federoff & Frank J. Gray, Beckman, Lawson, Sandler & Snyder, Fort Wayne, IN, for Lutheran Hosp. of Indiana, Mary Lou Isch and William A. Isch.

Vincent J. Heiny, Haller and Colvin, Fort Wayne, IN, for St. Joseph's Medical Center of Fort Wayne, Inc.

D. Randall Brown & Mark A. Garvin, Barnes and Thronburg, Fort Wayne, IN, for Business Men's Assur. Co. of America.

Frederick W. Dennerline & Stephen J. Lerch, Fort Wayne, IN, for Teamsters Local 135 Welfare Fund.

T. Jeffrey Hannah & Margaret A. Jones, Indianapolis, IN, for Acordia Local Government & Associated Ins. Companies, Inc.

George N. Bewley, Fort Wayne, IN, William W. Hinkle, Hinkle, Racster & Lopez, Portland, IN, for Community and Family Services.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiffs, Mary Lou Isch, William Isch and Lutheran Hospital (collectively, "Plaintiffs") brought this Declaratory Judgement action on June 17, 1992, seeking a determination of who, among the various named Defendants, is responsible for the medical bills incurred by Mary Lou Isch after June 1, 1991. On June 4, 1993 St. Joseph's Medical Center of Fort Wayne, Inc. was permitted by this court to intervene as a Plaintiff. This

matter is now before the Court[1] on the parties' respective cross motions for summary judgment, all filed July 17, 1993. This case arises under 29 U.S.C. § 1001, *et seq.*, The Employee Retirement Income Security Act ("ERISA"). Federal subject matter jurisdiction is based on 28 U.S.C. section 1331.

For the reasons stated below the Plaintiffs' motion for summary judgment against the Teamsters is GRANTED and Plaintiffs' motion for summary judgment against all other Defendants is DENIED, Plaintiffs' motion for summary judgment against St. Joseph's Medical Center is DENIED; Intervening Plaintiff's, St. Joseph's Medical Center of Fort Wayne's motion for summary judgment against the Defendants is DENIED, St. Joseph's Motion for Summary Judgement against Mary Lou Isch and William Isch is DENIED. Defendants', Associated's and Acordia's motion for summary judgment is GRANTED, Defendant's, Community's, motion for summary judgment is GRANTED, Defendant's Teamsters motion is DENIED.

## II. FACTS

The parties have submitted stipulated facts and agreed exhibits.[2] The Court now adopts those facts and incorporates them into this order. They are as follows:

2. Definitions:

2.1 "Acordia". Acordia Local Government Benefits, Inc.

2.2 "AE". Agreed Exhibit. The identification designation given to a document which was submitted by the parties as an agreed exhibit. The Agreed Exhibits were filed with the Court on June 28, 1993.

2.3 "Associated". Defendant, Associated Insurance Companies, Inc., d/b/a Blue Cross/Blue Shield of Indiana.

2.4 "BMA". Defendant, Business Men's Assurance Company of America.

2.5 "Cobra". Consolidated Omnibus Budget Reconciliation Act, Part 6 of Subtitle B of Subchapter I of the Employee Retirement Income Security Act at 29 USC § 1161 *et seq.*

2.6 "Community". Defendant, Community and Family Services, Inc.

2.7 "Horton". Gina Horton.

2.8 "IMS". Insurance Marketing Services, Inc.

2.9 "Lutheran". Plaintiff, Lutheran Hospital of Indiana, Inc.

2.10 "Patient". Plaintiff, Mary Lou Isch.

2.11 "Mikel". Katrina Mikel.

2.12 "St. Joe". Plaintiff, St. Joseph Medical Center of Fort Wayne, Inc.

2.13 "Teamsters". Defendant, Teamsters Local 135 Welfare Fund.

2.14 "Mr. Isch". Plaintiff, William A. Isch.

3. Stipulations of Fact:

3.1 Patient was admitted to Wells Community Hospital of Bluffton, Indiana on April 28, 1991.

3.2 On April 30, 1991, Patient was transferred to Lutheran.

3.3 Patient was discharged from Lutheran on September 26, 1991, and transferred to St. Joe.

3.4 Patient was discharged from St. Joe on December 27, 1991.

3.5 Since her discharge from St. Joe, the Patient has received rehabilitative therapy on an outpatient basis at Ball Memorial Hospital.

3.6 At the time of Patient's initial hospitalization at Lutheran, Patient was employed by Community as a teacher and received group health insurance coverage under Community's group health insurance plan, underwritten by BMA.

3.7 Community terminated its group health insurance contract with BMA effective May 31, 1991.

3.8 Patient's premiums were paid by Community to BMA through May 31, 1991.

3.9 BMA paid contract benefits on behalf of Patient through May 31, 1991.

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Hereafter, "Stip. fact,....." Agreed Exhibits will be referred to as "AE...., p......"

3.10 Plaintiffs have made no claim for damages against BMA relating to medical expenses of Patient incurred prior to June 1, 1991.

3.11 On May 22, 1991, Mr. Isch completed AE–19 [BMA's application for COBRA continuation coverage] and forwarded it to BMA.

3.12 On May 22, 1991 Mr. Isch completed AE–20 [BMA's Application for information about a conversion of group insurance] and forwarded it to BMA.

3.13 Mr. Isch handled all insurance matters for Patient during her illness.

3.14 On June 17, 1991, Mr. Isch executed AE–28 entitled "Application for Continuation of Group Coverage as Allowed by Federal Law", and sent it along with a check for COBRA continuation coverage to BMA.

3.15 Mr. Isch knew that Community had terminated its coverage with BMA at the time he submitted the form and check.

3.16 By letter dated July 1, 1991, BMA refused to honor the request for COBRA continuation coverage, declined to provide benefits for medical services provided to Patient after May 31, 1991, and returned the check submitted by Mr. Isch to Mr. Isch.

3.17 Prior to her hospitalization and continuing until the present time, Patient has had health care coverage as a dependant under the Teamsters group plan provided through Mr. Isch's employer, Hi–Way Dispatch.

3.18 Teamsters provides medical and disability benefits to its participants and their dependents through collective bargaining agreements between employers such as Hi–Way Dispatch and Teamsters Local Union No. 135.

3.19 Patient has been continuously covered by the Teamsters plan since 1985.

3.20 The Teamsters plan does not contain any pre-existing condition exclusion or limitation.

3.21 Teamsters has not limited or denied Patients claims on the basis of any pre-existing condition.

3.22 Patient filed a claim for benefits under the Teamsters plan.

3.23 The Teamsters plan has declined to provide benefits for certain medical services provided to Patient after May 31, 1991, based, in part, on the contention that Patient is entitled to COBRA continuation coverage from either BMA or Associated and one of these policies should have primary responsibility for the expenses.

3.24 Community contracted with Associated to provide group health benefits to its employees effective June 1, 1991.

3.25 In March or April of 1991, following notice from BMA that premiums would be increased, Community sought quotes for its group plan from other insurance companies.

3.26 At the time Community sought quotes, no Community employees were hospitalized and no former employees or other persons were receiving COBRA coverage.

3.27 In early April of 1991, Acordia, a third-party administrator under contract with Associated, learned through IMS that Community was requesting quotes for group health insurance coverage to be effective June 1, 1991.

3.28 In response, Acordia Submitted a proposal to IMS on April 16, 1991 to be forwarded to Community.

3.29 Community accepted Associated's proposal and notified Acordia of this fact before Patient was hospitalized.

3.30 On May 17, 1991, Gina Horton, who is a sales representative from Acordia, met with Mikel, Community's Chief Officer, and Larry Braden, Executive Director of Community, and Tim Mock of IMS. At that meeting, Community completed and submitted all applications and submitted other paperwork (including employee membership applications) for group health insurance coverage to be underwritten by Associated. All identified as AE–11, AE–13 through AE–17 (inclusive), AE–22 and AE–39.

3.31 On May 17, 1991, Mikel informed Horton that Patient was presently in the hospital.

3.32 Horton informed Community on May 17, 1991 that Patient would not be eligible for any insurance coverage under the Associated policy unless she was actively at work on June 1, 1991.

3.33 At Horton's request, Mikel wrote the word "COBRA" on the top of Patient's application.

3.34 On May 17, 1991, Horton informed Mikel that Patient would probably not be eligible for COBRA.

3.35 Patient was in the hospital on June 1, 1991.

3.36 When administrative personnel from Acordia reviewed the applications from Community, they saw the word "COBRA" and assumed Patient eligible for Cobra continuation coverage.

3.37 Acordia administrative personnel ordered an identification card and premium payment coupon book on June 4, 1991, which were mailed to the address on the Patient's application.

3.38 In early June 1991, Horton told Mikel that patient would not be eligible for COBRA as she had coverage under the Teamster's plan.

3.39 Associated never received any premium payments from Patient.

3.40 Associated had no communication or contact with Patient or Mr. Isch regarding COBRA continuation coverage other than the identification card and premium payment coupon booklets, which were mailed to the address on the application.

3.41 During the solicitation process, Associated learned that Community employed teachers who were off work for the summer.

3.42 Associated was unaware as to the date the teachers would be laid off.

3.43 Pursuant to its personnel policy, Community pays the teachers' group health insurance premiums during the nine-month school year.

3.44 During the summer months, the teachers are entitled to continue their insurance coverage by paying their own group health insurance premiums.

3.45 Associated received no insurance premiums from Community for Patient's coverage under the group policy.

3.46 At the May 17, 1991 meeting of Horton, Mikel, Larry Braden, and Tim Mock, Horton told Mikel that Horton believed that the Patient would not be eligible for coverage under the BMA policy.

3.47 BMA's contract to underwrite Community's health insurance policy to Community employees was terminated as of May 31, 1991 by Community.

3.48 Mikel told Mr. Isch that Associated probably would not cover his wife because of her illness.

3.49 Associated would have afforded COBRA continuation coverage to Patient from Associated if the Patient did not have coverage under the Teamsters plan, if the Patient had a qualifying COBRA event prior to June 1, 1991, and if the Patient made the proper elections and sent the appropriate insurance premiums to Associated.

## III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict

where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 477 U.S. at 252, 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropri-

ate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. FED.R.CIV.P. 56(c) & (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## IV. DISCUSSION

The parties in this matter do not dispute the material facts in this case; indeed, they have stipulated to them. However, they are clearly in disagreement over their legal ramifications. Plaintiffs, along with the Teamsters, allege that either Associated or BMA is the primary insurance carrier for Patient and that one or the other is responsible for providing medical insurance coverage for Patient's hospital and medical care. They contend that Associated, Acordia (as Associated's agent) and Community (as a plan sponsor) were responsible for providing Patient with COBRA continuation coverage beginning June 1, 1991. Alternatively, they argue that BMA should have provided patient with a conversion policy. Finally, they argue that if Associated (combined with Acordia and Community) or BMA are not responsible for providing insurance coverage, then Teamsters, as the sole remaining insurer, certainly is.[3]

3. Plaintiffs have also raised other miscellaneous issues regarding the standing of St. Joseph in this

Defendants in their cross-motions for summary judgment all deny any legal obligation to pay Patient's medical bills. Teamsters shares the view of the Plaintiffs, at least to the extent that they suggest that Associated, Acordia or BMA are primarily liable. Associated, Acordia and Community deny any responsibility to provide Patient with COBRA continuation coverage because they allege she was ineligible.[4] BMA contends that patient was not entitled to convert her group health care plan to an individual policy, and even if Patient had originally been entitled to a conversion policy she waived any entitlement when she failed to elect the conversion option in a timely manner.

## A. The Law Regarding Continuation Coverage under COBRA

Plaintiffs' claim for continuation coverage is governed by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161–1168. In 1986 Congress enacted COBRA, which amended the Employee Retirement Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. The COBRA amendments to ERISA were a response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R.Rep. No. 241, 99th Cong., 2d Sess. 44. *reprinted in* 1986 U.S.Code Cong. & Admin.News pp. 42, 579, 622. Pursuant to the COBRA amendments, individuals who lose coverage under their employers' group health care plan, due to certain qualifying events, may elect to continue, at their own expense, "participation in the health care plan provided by the former employer." 29 U.S.C. § 1161(a); *Coble v. Bonita House, Inc.,* 789 F.Supp. 320, 322 (N.D.Cal.1992).

Section 1163 of the statute defines those qualifying events that entitle a beneficiary to elect continuation coverage:

For purposes of this part, the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary:

(1) The death of the covered employee.

(2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

(3) The divorce or legal separation of the covered employee from employee's spouse.

(4) The covered employee becoming entitled to benefits under title XVIII of the Social Security Act [42 U.S.C.A. § 1395 *et seq.*].

(5) A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan.

(6) A proceeding in a case under Title 11, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

29 U.S.C. § 1163. So, if a qualified beneficiary would otherwise lose coverage as a result of one of these events, the statute provides the right to obtain continuation coverage. That coverage must be identical to the coverage received by any "similarly situated beneficiaries under the plan" who have not had a qualifying event. 29 U.S.C. § 1162(1). Continuation coverage, however, is not indefinite. Where loss of coverage results from termination or reduction in hours, continuation extends for a maximum period of eighteen months from the occurrence of the qualifying event. 29 U.S.C. § 1162(2)(A)(i). Section 1162 also permits an employer, in certain situations, to terminate continuation coverage prior to the eighteen months. For example, critical here is the

litigation, attorney's fees, costs, and prejudgment interest. These issues will be discussed *infra* at Section V.

**4.** BMA also alleges that Patient was not eligible to receive BMA continuation coverage. However, the parties all agree that to the extent that

Patient is entitled to continuation coverage, Associated would be the carrier responsible for providing it. (Stip. Fact, 3.49). Accordingly, BMA's fears regarding their responsibility for continuation coverage are unfounded.

fact that continuation coverage may be terminated on

> The date on which the qualified beneficiary first becomes, after the date of election—
>> (i) covered under any other group health plan (as an employee or otherwise) 'which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary'
>> . . . .

29 U.S.C. § 1162(2)(D).

■ Plaintiffs and the Teamsters allege that Patient suffered a qualifying event resulting in a loss of coverage on May 1, 1991 when she took a leave of absence for illness and that a second qualifying event occurred when she was laid off for the summer on May 25, 1991.[5] They contend that both events were a reduction in hours that resulted in loss of coverage as defined in section 1163(2) of the statute.

Associated, Acordia and Community oppose this view. They contend that Patient's loss of coverage was not the result of a qualifying event, but rather was caused by Community's change in insurance carriers. Associated's policy contained an "actively at work requirement" that Patient could not meet at the time Associated's policy took effect. According to these Defendants, it was Patient's inability to meet this eligibility requirement, and not one of the enumerated qualifying events in section 1163, that caused her loss of coverage. Their argument cites *Baker v. Bankers United Life Assurance Company*, 1991 WL 121237 (E.D.La.1991); a case involving an employer who switched insurance carriers. Although plaintiff, an employee, received coverage under his employer's new group health plan, his daughter was denied coverage for a preexisting condition. *Id.* The court held that COBRA did not entitle plaintiff to elect continuation coverage because the loss of coverage was not the result of a qualifying event as defined by the statute; rather, plaintiff's daughter's loss of coverage was due solely to the switch in policies. *Id.*

Notwithstanding the reliance of Associated, Acordia and Community on *Baker*, this case is different and more closely resembles the facts of *Collins v. Strategic Health Care Management Services, Inc.*, 1992 WL 92099 (N.D.Ill.1992). In *Collins*, the plaintiff was terminated by her employer. At the time of her termination she was told that she would remain covered under her employer's group health plan but she had to pay her own premiums. Two months after her termination her employer switched insurance carriers. The old policy expired and plaintiff was denied coverage under the new policy because, to be eligible, all covered employees had to be full-time and actively at work; a requirement plaintiff could not meet because she had been terminated just a few months earlier. The court held that plaintiff's loss of coverage resulted from her termination, a qualifying event, and therefore she was entitled to COBRA continuation coverage. In so holding, the court noted that, "[t]o 'lose coverage' under a group health plan means to cease to be covered under the terms and conditions in effect immediately before the qualifying event.... Loss of coverage need not occur immediately after the qualifying event so long as the loss of coverage occurs before the end of the eighteen month maximum coverage period." *Id.* at *5, 6. As a result of plaintiff's termination she was no longer covered under the "same terms and conditions," and therefore had suffered a qualifying event entitling her to continuation coverage. *Id.*

Like the plaintiff in *Collins*, Patient lost coverage because under the new policy she could not meet an actively at work requirement. Associated's policy defines " 'Actively at work' [as] ... present and capable of carrying out the normal assigned duties of the Group." (AE 39, p. 8). However, the reason patient was not "present and capable" of carrying out her duties on June 1, 1991 (the date the policy took effect) was because she was on a leave of absence due to illness and because she had been laid off for the summer. Thus, the very reason Patient could not meet the new policy's eligibility

---

**5.** The significance of a second qualifying event would be an extension of the maximum period of continuation coverage from 18 months to 36 months. 29 U.S.C. § 1162(2)(A)(ii).

**1284**

requirement was because she had suffered (like the plaintiff in *Collins*) a "qualifying event."

Therefore, while Patient's "reduction in hours" did not directly cause termination of coverage under the old plan, the fact remains that a qualifying event resulted in a loss of coverage to Patient. Simply put, if Patient had not taken sick leave or been laid off she would have met the actively at work requirement and would have remained covered. *Collins v. Strategic Health Care Management Services, Inc.*, 1992 WL 92099 (N.D.Ill. 1992). Therefore, the reduction of hours was a qualifying event entitling Patient to elect continuation coverage because "but for" such a right, she would lose coverage.

Associated, Acordia and Community argue, however, that even if Patient suffered a qualifying event she was ineligible for continuation coverage because she was already covered as a dependant under her husband's group health care plan. They point to section 1162(2)(D)(i) which permits an employer to terminate continuation coverage on

> The date on which the qualified beneficiary first becomes, after the date of the election—
>> (i) covered under any other group health plan (as an employee or otherwise) 'which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary'

29 U.S.C. 1162(2)(D). Associated, Acordia and Community contend that because patient was already covered under another group health plan this language permitted them to terminate Patient's right to COBRA continuation coverage immediately after election (essentially rendering her ineligible).

In response, the Plaintiffs and the Teamsters zero in on the statutory language "*first becomes, after the date of election*" for the arguable proposition that since Patient already had Teamsters coverage she did not "**first become**" covered by any other health insurance "**after the date of [COBRA] election.**" Therefore, any preexisting group health coverage did not negate the employer's obligation to provide continuation coverage. *See Oakley v. City of Longmont*, 890 F.2d 1128 (10th Cir.1989), (a beneficiary's

coverage under a preexisting group health care plan does not relieve an employer of its obligation to provide that individual with continuation coverage).

In fact, three circuits have dealt squarely with this very issue, and with differing results. First came *Oakley. Id.* Next came the Fifth Circuit's decision in *Brock v. Primedica, Inc.*, 904 F.2d 295 (5th Cir.1990); followed by the Eleventh Circuit's decision in *National Companies Health Benefit Plan*, 929 F.2d 1558 (11th Cir.1991). The Fifth and Eleventh Circuits held than an "ERISA provider is not required to offer continuation coverage to an employee or his dependents who are covered under a preexisting group health plan," *National Companies*, 929 F.2d at 1566; *Brock*, 904 F.2d 295, unless there is a significant gap in coverage between the two plans. *National Companies*, 929 at 1569; *Brock*, 904 F.2d 295. The parties have discussed this trio of cases in their respective briefs with each party urging the Court to follow the approach most favorable to its own position. Any decision along these lines requires a brief review of the facts and holdings of each case; however, before turning to them, an examination of the statutory history of section 1162(2)(D) is necessary.

As originally passed in April of 1986, COBRA permitted an employer to terminate continuation coverage on the date on which the qualified beneficiary first became, "after the date of election[,] ... a covered employee under any other group health plan." COBRA, Pub.L. No. 99–272, § 10002(a), 100 Stat. 82, 228. Then, in October of 1986, Congress amended this section to allow termination on "The date on which the qualified beneficiary first becomes, after the date of election[,] ... covered under any other group health plan (**as an employee or otherwise**)." Tax Reform Act, Pub.L. No. 99–514, § 1895(d)(4)(B)(ii), 100 Stat. 2085, 2938. (emphasis added). Finally, in 1989, Congress amended this section to permit termination of continuation on "The date on which the qualified beneficiary first becomes, after the date of election[,] ... covered under any other group health plan (as an employee or otherwise) '**which does not contain any exclusion or limitation with respect to any**

preexisting condition of such beneficiary.' " Pub.L. No. 101–239, § 7862(c)(3)(B)(ii), 103 Stat. 2106, 2432. (emphasis added). However, only the 1986 version of the statute was in effect at the time of *Oakley, Brock* and *National Companies.* So, with this history understood, we turn to those cases.

We begin with the Tenth Circuit's decision in *Oakley.*[6] Plaintiff, Oakley, was covered under both his employer's, and his wife's group health plan. Oakley was in a car accident and suffered a serious head injury. His employer eventually terminated him and discontinued his group health coverage. Oakley's employer then denied him continuation coverage reasoning that because he was covered as a dependant under his wife's group health care plan he was ineligible. Unfortunately, the wife's plan did not cover costly rehabilitation therapy for a brain injury, while the employer's plan did. "The Tenth Circuit held that an employee's coverage under his spouse's preexisting group health plan does not permit [an employer] to terminate, or refuse to offer, continuation coverage under its plan." *National Companies,* 929 F.2d at 1568, (citing *Oakley,* 890 F.2d at 1132). In construing the statutory language "first becomes after date of election" the Court found that the plain language of the statute clearly meant that continuation coverage could terminate only if insurance was acquired *after* the qualifying event. In other words, the mere fact that other coverage (perhaps through a spouse)—would immediately step into the breach was not enough to allow a denial of continuation coverage. Moreover, after looking at the legislative history of the section the Court interpreted the newly-added statutory phrase "as an employee or otherwise" to mean that any termination of continuation coverage was to be limited to those situations where "the covered employee becomes covered by another policy because he obtains new employment, is reemployed, or remarries." *Oakley,* 890 F.2d at 1132. So, since that was not

Oakley's situation, the termination of his continuation coverage had been improper. *Id.* at 1133.

Notably, at the time *Oakley* was decided, a termination under section 1162(2)(D)(i) was permitted once the beneficiary became covered (no matter what the coverage) under **any** other group health care plan. Although the Tenth Circuit did not narrow its holding to those situations where there was a gap or difference in coverage, it was an obvious motivating concern, as evidenced by the statement that, "[s]urely the facts of this case illustrate the precise gap in coverage which troubled Congress." *Id.* at 1133. Indeed, just 10 days after the *Oakley* decision Congress amended section 1162(2)(D)(i) to what it does today: prohibits termination of continuation coverage (because of coverage under some other group health plan) where the new group health plan "contain[s] any exclusion or limitation with respect to any preexisting condition of such beneficiary..." 29 U.S.C. § 1162(2)(D)(i) (1989).

In any event, *Oakley* was followed by the Fifth Circuit's decision in *Brock v. Primedica,* 904 F.2d 295 (5th Cir.1990). Like Oakley, the plaintiff in *Brock* was covered under both her employer's group health plan, and as a dependant under her spouse's group policy. Plaintiff resigned, retained coverage under her spouse's plan, but also elected continuation coverage and subsequently submitted claims for benefits. When the carrier received the claims it discovered that the plaintiff was also covered as a dependant under her spouse's preexisting group health care plan. The carrier then denied benefits, refunded the premiums, and informed the plaintiff that she was not entitled to continuation coverage. In addressing plaintiff's ERISA claim, the Fifth Circuit took a more limited approach than *Oakley.* It held that plaintiff was entitled to continuation coverage only if there was a significant gap in coverage between her old plan, and her spouse's plan.[7] Since no such gap existed, the Fifth

---

6. "[T]he Tenth Circuit analyzed COBRA's amendments to the Public Health Service Act ("PHSA"), 42 U.S.C. §§ 201 to 300aaa–13 (1988), ERISA's statutory counterpart governing group health plans for certain state and local employees." *National Comp.,* 929 F.2d at 1568.

7. The Fifth Circuit actually interpreted the Oakley Court's holding as being limited to situations

Circuit determined that Brock was not entitled to continuation coverage. In fashioning this limitation, the Fifth Circuit noted that in *Oakley* some emphasis had been placed on the gap in the character of coverage of the two plans at issue, and the subsequent amendment to section 1162(2)(D)(i). The Fifth Circuit opined:

> This amendment further emphasizes Congress's concern that group health plan participants and their dependents not be placed in a situation in which they suffer a gap in the character of coverage as the result of a "qualifying event" such as termination of employment.

*Id.* at 297.

Shortly after the *Brock* decision, the Eleventh Circuit also had an opportunity to interpret the 1986 version of section 1162(2)(D)(i). *See National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558 (11th Cir.1991). The Eleventh Circuit, after reviewing both *Brock* and *Oakley,* found *Brock* to be the better statement of the law. In so doing, the Court compared the decisions in *Oakley* and *Brock* and then analyzed the legislative history of, and recent amendments to, section 1162(2)(D)(i).

The Eleventh Circuit found the true purposes of COBRA were actually furthered as a result of the limited approach taken in *Brock;* for example:

> Congress created the terminating event at issue here—'[t]he date on which the qualified beneficiary first becomes, after the date of election[,] covered under any other group health plan (as an employee or otherwise)'—to permit employers to terminate continuation coverage whenever an employee receiving such coverage was protected by another group health plan, and, thus, did not need continuation coverage. This clearly includes employees covered under their spouses' preexisting group health plans. In such a setting, the concerns that motivated Congress' enactment of COBRA generally are not present; the employee has group health coverage.

where there was a significant gap in coverage, but as the Eleventh Circuit later correctly pointed out,

*National Companies,* 929 F.2d at 1570. Moreover, the court criticized the Oakley Court's interpretation of the phrase "as an employee or otherwise" to effectively mean only reemployment or remarriage. In reaching this conclusion the Tenth Circuit relied on the legislative history of COBRA and its amendments. The Eleventh Circuit found that the Tenth Circuit had been somewhat casual in its interpretation of the legislative history of COBRA and criticized that court's failure to address the legislative history of the Tax Reform Act which actually added the phrase "as an employee or otherwise." In discussing the Tax Reform Act the Eleventh Circuit noted that "Congress described its amendment to ERISA's 'other coverage' termination provision as providing for the '[t]ermination of continuation coverage upon coverage by [an]other group health plan *rather* than upon reemployment or remarriage.'" *Id.* (citing Tax Reform Act, Pub.L. No. 99–514, § 1895(d)(4), 100 Stat. 2085, 2938 (emphasis added).

Based on this, the Eleventh Circuit held that "[i]n the case of an employee covered by preexisting group health coverage ... such an employee is ineligible for continuation coverage ... [unless] there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan." *National Comp.,* 929 F.2d at 1570–1571.

Plaintiffs and Teamsters argue that the Oakley approach is better. First, they assert that the real purpose of COBRA is to guarantee the insurance status quo for a beneficiary who has a qualifying event, and this purpose can best be fostered by permitting individuals with preexisting group health insurance (perhaps, through a spouse) to still elect continuation coverage because it protects that person's ability to maintain double coverage. Second, Plaintiffs argue that interpreting COBRA as giving employers the right to deny continuation coverage to those with a preexisting group health care plan unfairly penalizes those individuals. The argument goes something like this: a person who elects continuation coverage and whose spouse subsequently obtains group health in-

*Oakley* was much broader. *National Comp.,* 929 F.2d at 1569.

surance, can simply decline the offered dependency coverage in order to avoid termination of the preferred COBRA coverage; however, an "employee, such as Patient [whose spouse already has her covered under an existing group policy], is forced to accept [the spouse's employer's] coverage which they had previously rejected." (Plaintiff's Reply Bf., p. 8). However, even under the Plaintiffs' interpretation of COBRA, unfairness would not be eradicated; rather, they would merely flip-flop what they perceive as a statutorily-created advantage so that it would work to benefit those with preexisting coverage. For instance, Plaintiffs concede that if after electing COBRA coverage the former employee chooses dependency coverage under a spouse's group health insurance, COBRA coverage would cease. This forces a coverage choice upon such individuals. Yet, as the Plaintiffs would have it, a qualified beneficiary with preexisting coverage would not be forced to choose, instead he or she would automatically maintain double coverage—something denied the person who, but for a different sequence of events, is similarly postured. Indeed, this underscores what is the true intent of COBRA, to provide some continued access to affordable private health insurance—not the maintenance of every employee's insurance status quo. Moreover, and as noted, the fairness argument is genuinely unpersuasive because under the Plaintiffs' interpretation of the statute, they simply shift, not remove, "unfairness."

Plaintiffs also argue that a beneficiary with a preexisting group health plan is prejudiced if denied continuation coverage because that individual may be forced to accept coverage under a spouse's health plan even though it has significantly less coverage. For example, and to grossly over-simplify, the employer's plan may provide for a maximum coverage of $1,000,000, while her spouse's plan may have a $5,000 cap. Plaintiffs argue that the denial of COBRA coverage in this situation is unfairly detrimental because it exposes the beneficiary to substantial personal liability. This argument, however, ignores the rule set out by the Fifth and Eleventh Circuits and the current statutory language. Coverage may not be terminated where there is a significant gap in coverage be-

tween the two plans, *National Comp.*, 929 F.2d at 1570–1571; *Brock*, 904 F.2d 295, or where the other group health plan "contain[s] any exclusion or limitation with respect to any preexisting condition of such beneficiary ..." 29 U.S.C. § 1162(2)(D). Under this statement of the law, COBRA benefits do not have to be offered when the pre-existing coverage provides substantially the same protection as the continuation coverage.

Such a reading again marks the true intent of Congress. In fact, to permit a covered employee to elect continuation coverage merely because that coverage antedates a qualifying event, without regard to pre-existing and immediately effective coverage, does little to further the stated purpose of COBRA. As noted, the thrust of COBRA is not the maintenance of an employee's health insurance status quo. Rather, the COBRA amendments to ERISA were enacted in response to " 'reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.' " *Gaskell v. Harvard Coop. Society*, 3 F.3d 495, 498 (1st Cir.1993) (quoting, H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.Code Cong. & Admin.News 579, 622); *see also, National Comp.*, 929 F.2d at 1567. COBRA represents a legislative " 'effort to provide continued access to affordable private health insurance for some of these individuals,' H.R.Rep. No. 241, at 44, 1986 U.S.Code Cong. & Admin.News at 622, without increasing the 'staggering budget deficits now facing the United States.' *Gaskell v. Harvard Coop. Society*, 3 F.3d 495, 498 (1st Cir.1993) (quoting, S.Rep. No. 146, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 42, 43); *see also National Companies*, 929 F.2d at 1567. Individuals already covered by at least one health care plan (without limitation on preexisting conditions) are thus able to obtain affordable health care, and do not need the luxury (at least the statutorily-mandated luxury) of double coverage.

■ Overall, the reasoning of the Eleventh Circuit is more in line with the true purpose

of COBRA; leading this court to an adoption of its interpretation of section 1162(2)(D)(i). Accordingly an "ERISA provider is not required to offer continuation coverage to an employee or his dependents who are covered under a preexisting group health plan," *National Companies*, 929 F.2d at 1566; *Brock*, 904 F.2d 295, unless there is a significant gap in coverage between the two plans, *National Companies*, 929 F.2d at 1569; *Brock*, 904 F.2d 295, or unless there exists "any exclusion or limitation with respect to any preexisting condition of such beneficiary ..." 29 U.S.C. § 1162(2)(D)(i).

### B. The Law of COBRA Continuation Coverage as Applied to the Facts of This Case

At the time that Patient experienced her initial qualifying event she was in the hospital, seriously ill with Guillane–Barrè Syndrome and subsequently forced onto life supports.[8]

■ The question now remaining is whether there then existed some "significant gap" between the new Associated, and the preexisting Teamster, policies.[9] In other words, policy gaps are permissible, as long as they are not "significant." In placing the two policies side-by-side, it is apparent that the only real relevant difference between the two is their respective caps on total benefits. The Teamsters' policy has an annual calendar year limit of $250,000 in major medical expenses, but no lifetime limit. Associated's policy has no annual limit, but provides for a lifetime limit of $1,000,000 in total benefits. Plaintiffs and Teamsters (now armed with the clarity of hindsight) allege that this difference represents a "significant gap" in coverage because Patient incurred medical bills in excess of $285,000 during calendar year 1991, thereby leaving her personally liable for over $35,000 under the Teamsters' policy, while under Associated's policy she would have been responsible for only $750 (A $200 deductible plus 20% of the first $2500 of incurred medical bills).[10]

■ Plaintiffs' and Teamsters' position is haunted by a flawed analysis. Employers and insurance companies must be able to make decisions regarding whether they must offer COBRA continuation coverage when the original coverage ceases. If the law were such that Courts could simply make *post hoc* determinations regarding "significant gaps" in coverage based on a patient's subsequently incurred medical bills for a discrete period of time, then employers and insurance companies would constantly be subjected to the second-guessing that Plaintiffs and Teamsters engage in here. Indeed, if that became the rule, decisions regarding whether continuation coverage should even be offered during the COBRA election period would frequently have to await unknown (indeed, unknowable) facts and scenarios—with almost an infinite number of permutations. Any employer with a hazy crystal ball, who guesses wrong, would be subject to ensnarement by just such unforeseeable events. What

8. Guillane Barrè Syndrome is an acute, rapidly progressive disease process involving many peripheral nerves. "It is characterized by muscular weakness and sensory loss.... The weakness often ascends from legs to arms to face.... In severe cases, motor cranial nerves and trunk muscles may be involved and respiration may be impaired. The respiratory paralysis and autonomic deficits may be life-threatening.... Recovery over a period of months is usual if the patient survives the acute episode. Residual defects may require retraining, orthopedic appliances, or corrective surgery." The Merck Manual of Diagnosis and Therapy, p. 1386–1387 (14th Ed. 1982).

9. While any exclusion or limitation for preexisting conditions is also a COBRA consideration, 29 U.S.C. § 1162(2)(D)(i), there is no dispute that the Teamster's policy also covered the subject condition, treatment and therapy. Therefore, any statutory requirement that continuation coverage be offered to Patient did not spring from a preexisting condition.

10. The parties are in disagreement over whether the Isch's medical bills actually exceeded the $250,000 limit under the Teamsters policy. The other defendants have alleged that some of Patient's medical treatment should really be categorized as something other than major medical and thus covered under some other portion of the policy with no annual limit. However, this cannot be determined at the present time because the record does not have a complete set of Patient's medical bills and records, only those from St. Joseph's. Moreover, under the Court's analysis for determining whether a gap truly exists, it simply does not matter.

such uncertainty would also do to the group health insurance industry is also rather unclear, but certainly it is counter-intuitive to the very notion that an insurance company can limit future risks through the underwriting process. Therefore, it would not be a proper function of the court to look with hindsight at the bills actually incurred in a given illness/accident so as to determine a beneficiary's personal exposure under each policy, and from that determine whether a violation of COBRA has occurred. Rather, the court must look to the difference in the policies at the time of election and thus determine whether a significant gap in coverage truly existed. In so doing, the policies should be examined to determine their benefits, whether there is any exclusion or limitation on the patient's preexisting condition, and with a view to the treatment the beneficiary may foreseeably require. *See generally, Brock,* 904 F.2d at 297 & fn. 1. With respect to any dollar caps on coverage (all that really is at issue here), the "gap" (if any) must be significant enough to alert a reasonable person of the potential for substantial personal liability under the new plan, that does not exist under the old. *See generally, National Companies,* 929 F.2d at 1571. So, the Court should view these policies as if a choice had to be made in June 1991, knowing full-well that the Patient has Guillane–Barrè Syndrome, but not knowing her future medical costs or their duration. If thus viewed, there is no significant gap in the policies. Although Community, Associated and Acordia all had notice that Patient was suffering from a serious illness, and large medical bills would likely follow, there was no reason to believe then that they would exceed $250,-000.00 during the remaining calendar year. This was particularly true given that Patient became sick midyear, meaning that Teamster's $250,000 annual benefits for the first calendar year would have been drawn on for only 7 months—from June 1 through December 31, 1991. Thereafter, and if the medical bills lasted that long, beginning on January 1, 1992 she would start anew, and would be covered for another $250,000 in major medical for 1992. Although from the perspective of hindsight the plaintiff now has arguably greater exposure to personal liability under the Teamsters' plan, this merely suggests a difference between two policies (both of which would have paid substantial benefits in any event) and does not amount to a "significant gap" in coverage. Moreover, looking at both policies, one could easily come to the conclusion that an annual cap (but with no lifetime limit) would have been the best thing for someone suffering from Guillane–Barrè Syndrome and its potential residual defects ("recovery over a period of months is usual." *See* fn. 8, *supra* ). Therefore, the difference must represent a substantial gap in coverage on the face of the policy in light of the beneficiary's then-apparent condition. At the time of COBRA election here, $250,000 annually was significant coverage and it was reasonable to assume that Patient would have been adequately covered (particularly since there were no lifetime limits). On the other hand, it could have been envisioned, if future events played out somewhat differently, that Patient would eventually exceed the $1,000,000 lifetime limit in Associated's policy ("Residual defects may require retraining, orthopedic appliances, or corrective surgery." *See* fn. 8, *supra*), thus subjecting her to even greater personal exposure. Indeed, it could be argued that exhausting insurance coverage for only a given calendar year is preferable to exhausting it for life. Thus, despite some apparent differences, it could not have been said at the time of COBRA coverage election that there existed "significant gaps" in these two coverages.[11]

Therefore, even though she suffered a qualifying event, because Patient was covered under the Teamsters' policy, she was ineligible for COBRA continuation coverage as a matter of law. Accordingly, Plaintiffs' allegations regarding Defendants' breach of fiduciary duty based on a failure to properly

---

11. Also noteworthy is that under either the Teamsters' or Associated's policy, payment of benefits is limited to reasonable and customary charges. (*See,* AE 40, p. 12, 14 and AE 39, p. 8 respectively). Thus, Patient's actual insurance benefits under both policies may be less than the actual total medical bills incurred. This point is highlighted by the present dispute between St. Joe and the Isch over the charges incurred during her inpatient stay at St. Joe's.

notify and advise Patient of her right to continuation coverage are moot.

## C. The Question of the Conversion Policy

■ Plaintiffs next argue that BMA should have given patient the opportunity to convert her coverage under the group policy to coverage under an individual policy. St. Joe's argues that Patient's right to a conversion policy is a federally protected right established by COBRA. COBRA does mandate, in limited circumstances, that a plan sponsor offer a qualified beneficiary a right to convert from group to individual coverage. Title 29 of the United States Code, section 1162(5) provides:

> In the case of a qualified beneficiary whose period of continuation coverage **expires under paragraph (2)(A)**, the plan must, during the 180–day period ending on such expiration date, provide to the qualified beneficiary the option of enrollment under a conversion health plan otherwise generally available under the plan.

29 U.S.C. section 1162(5) (emphasis added). However, under this provision Patient had no right of conversion. The conversion option is triggered by the continuation provisions of 29 U.S.C. section 1162(2)(A) which provides for termination at the end of the maximum period of coverage. However, as earlier explained, Patient's continuation coverage did not expire under paragraph (2)(A), rather her coverage terminated under (2)(D) due to coverage under another group health care plan.[12] Moreover, any conversion right that existed was under the plan administering COBRA coverage at the time of expiration. *Id.* Thus, even if patient's continuation coverage had terminated under 29 U.S.C. section 1162(2)(A), any conversion right existed only under Associated's policy, not BMA's.

■ Nonetheless, Patient and Lutheran still contend that BMA is obligated to provide conversion coverage, not because of COBRA, but by its own policy terms. In support of their contention they point to the following policy provision:

An Insured may convert group medical coverage to a conversion policy if coverage terminates due to the Insured's:

- termination of employment; or
- termination of membership in an eligible class.

(AE 38, p. 18). Plaintiffs contend that Patient's "membership in an eligible class" was terminated when Community cancelled the whole group health plan, thus giving rise to a contractual entitlement to elect a conversion policy. BMA's response is that cancelling a policy is not the same as terminating membership in an eligible class. According to BMA, only a change in employment status rendering the individual ineligible for benefits would qualify the employee for conversion rights.

■ Interpretation of the provisions of an ERISA plan is a matter of federal law, *Haley v. American Int'l Life Assurance Co.*, 789 F.Supp. 260, 261 (N.D.Ill.1992), and in so doing the Court should employ trust and contract principles. *Allen v. Adage, Inc.*, 967 F.2d 695 (1st Cir.1992). However " 'ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans,' " *Reid v. Prudential Ins. Co. of Amer.*, 755 F.Supp. 372, 375 (M.D.Fla.1990) (quoting *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1501 (9th Cir.1985)), and therefore in fashioning a federal common law on the subject the court should look to relevant state contract law for guidance. *Id.*, See also, *Haley*, 789 F.Supp. at 261.

■ In looking to the meaning of the policy language, if it is unambiguous, the court should follow its plain meaning. It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, including the signatures, must be given meaning, and force and effect, if that can consistently and reasonably be done. An interpretation which gives reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless, meaningless, or inexplicable.... No word or clause should be rejected as mere surplusage if the court can discover any

---

12. See Section IV(A)(B) *supra.*

reasonable purpose thereof which can be gathered from the whole instrument.

17A AM.JUR.2D *Contracts* §§ 386, 387 (1991); *See also, Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2nd Cir.1988) ("[I]nterpretation [that] would have the effect of rendering at least one clause superfluous or meaningless.... is not preferred and will be avoided if possible.") With these principles in mind we turn to the policy language; that is, whether termination of coverage "due to the Insured's ... termination of membership in an eligible class" includes the fact situation here.

Pursuant to BMA's policy, "coverage terminates" on the earliest of the following dates:

- The date the Insured fails to make any required premium payment;

- The last day of the policy month that is the same as or next follows the date employment ceases, if coverage depends on employment. Employment ceases on the date the person is no longer actively at work. However, if absence from active work is due to sickness or injury, and that person is still considered an employee, insurance may continue as long as premiums for that person are paid.

At the option of the Policy owner an Insured's coverage may be continued under these conditions:

1) during a temporary layoff but not beyond the end of the policy month following the month in which the layoff starts; or

2) during an authorized leave of absence granted by the Policyowner for reasons other then sickness or injury. It may not be continued beyond the period ending 3 months after such leave of absence starts.

- The last day of the policy month that is the same as or next follows the date **the Insured ceases to be in a class of persons eligible for insurance;**
- The date the class of persons to which the Insured belongs is no longer eligible for insurance; or
- **The date this policy terminates.**

(AE 38, p. 20) (emphasis added). BMA's policy terminated on May 31, 1991. (Stip. fact, 3.7). Patient's coverage would have terminated with it. Nevertheless, this was not the same as a "termination of membership in an eligible class" (for conversion purposes). In discussing dates for possible termination of coverage, it is noted that the policy separately provides for a date when the "Insured ceases to be in a class of persons eligible for insurance" as well as "[t]he date th[e] policy terminates." Consistent with general principles of contract construction we must interpret this language as meaning two distinct events. Indeed, interpreting the former as encompassing the latter would render the second mere surplusage and such a reading is not preferred and should be avoided whenever possible. *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2nd Cir.1988). As a matter of fact, a BMA policy owner can terminate a policy on any date "for any class of insureds or all classes of insureds." (AE 38, p. 25). Clearly then, since the policy could terminate as to some classes but not others, termination of the entire policy (the event that occurred here) is wholly different from any termination of membership in an eligible class (the event triggering the conversion option). Therefore, since Patient did not lose coverage due to termination of membership in an eligible class (but rather, as a result of termination of the policy itself) BMA had no policy obligation to extend a conversion option to her.[13]

Having held that BMA was under no obligation to provide Patient with a conversion

---

**13.** As a result, the Court need not consider whether Patient's illness or lay-off triggered any conversion right because neither event caused her a loss of coverage. The BMA policy states at page 20 (AE 38, p. 20) that coverage effectively terminates on the "earliest date" that any of the listed events occurs. Patient's policy terminated May 31. Although Plaintiff became ill in May, Community continued to pay her premiums through the end of May, so her coverage did not terminate as a result of her being "no longer actively at work." While Plaintiff also was laid off May 25, her coverage would not have terminated until "the end of the policy month following the month in which the layoff starts"—in this case July 1. Therefore, the actual termination of the policy was the earliest of these events and became the sole cause of her loss of coverage.

option, BMA's argument regarding Patient's failure to elect in a timely manner is moot. Likewise Plaintiffs' allegations that BMA failed to provide Patient adequate notice of conversion rights in breach of its fiduciary duty is also moot.

## V. MISCELLANEOUS

### A. St. Joe's Standing

■ St. Joe's has moved for summary judgment on its cross-claim against Mary Lou and William Isch seeking judgment in the amount of $71,358.84, for inpatient services provided to patient from September 26, 1991 to December 27, 1991. The Ischs respond that any claim for damages against them is premature because, on May 11, 1993, this Court ordered that the parties' motions for summary judgment address liability only. The Court agrees and accordingly denies St. Joe's motion for summary judgment on its cross-claim against Mary Lou and William Isch.

■ St. Joe's has also moved for summary judgment on its claim for declaratory judgment against the Defendants. This claim is premised upon St. Joe's assertion that it obtained an assignment of Patient's rights to her insurance proceeds and therefore is entitled to directly pursue any claims Patient has against the Defendants. "An assignment is a transfer which confers complete and present right in a subject matter to the assignee. [citations omitted].... The assignee takes no greater rights than those possessed by the assignor." *Brown v. Indiana Nat. Bank*, 476 N.E.2d 888, 894 (Ind.App.Ct.1985). So, if St. Joe does have a valid assignment of rights then it too is entitled to a judgment against the Teamsters. *See*, Sections I–IV, *infra*.

The Plaintiffs, Lutheran Hospital, Mary Lou Isch and William Isch contend, however, that there has been no assignment of Mary Lou and William Isch's right. Therefore, they argue, St. Joe lacks standing to directly make a claim for relief against the Defendants and summary judgment should be entered against St. Joe's in this matter. The controversy centers around the assignment of rights provision contained in St. Joe's admission and authorization form titled "CONSENT TO TREATMENT." When Patient checked into St. Joe she was accompanied by her sister, Glenda Williams. At some time during the admissions process Williams was presented with this one page authorization form. The authorization contained a paragraph half-way down the page that provided for an assignment to St. Joe by the patient of all rights to insurance benefits.[14] Williams signed Patient's name and her own name on this form. Patient now alleges that she "did not sign nor execute" the assignment of rights document, and she "did not authorize anyone to execute [the assignment] on [her] behalf." (Patient's affidavit of 7/17/93, ¶¶ 4, 5). Furthermore she claims that "[a]t no time did [her] sister Glenda Williams nor any personnel from St. Joe, nor any other person, explain to [her] the existence or the terms or conditions of [the assignment]...." (Patient's affidavit of 7/28/93, ¶ 5). Patient asserts that her lack of knowledge or authorization renders the assignment invalid.

St. Joe has countered with the affidavit of Cheryl Jovevski, the Manager of Patient Registration. Jovevski admits that she states that at the time of her admission it was "the policy of St. Joe to have the form document ... explained to the patient at the time of admission, if competent, and signed by a relative on behalf of the patient, if the patient is unable to sign." (Jovevski Affidavit of 7/19/93, ¶ 4). This evidence raises a genuine issue of material fact. Although it does not directly contradict Patient's statement, "[e]vidence of ... the routine practice of an organization ... regardless of the pres-

---

**14.** That paragraph states in full:
AUTHORIZATION TO PAY INSURANCE BENEFITS: I hereby assign to St. Joseph Medical Center and the attending physician(s), as their interest may appear, all Medical Center and physician(s) expense benefits which are due or are to become due to me as a result of medical services to the above patients. I here- by authorize the payments to be paid directly to St. Joseph Medical Center and to attending physician(s). Any and all such payments shall constitute a discharge in full to the insurance company to the extent of the benefits paid. I understand I am financially responsible to the Medical Center for charges not covered by this authorization.

ence of eyewitnesses, is relevant to prove that the conduct of the ... organization on a particular occasion was in conformity with the ... routine practice." Fed.R.Evid. 406. The opposing affidavits in this matter "present[ ] a sufficient disagreement to require submission to a jury...." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2511–2512.

St. Joe also alleges that even if Patient did not actually authorize the assignment of rights she is bound by the assignment because Williams, acting as her agent, had apparent authority to assign Patient's rights and because Patient, by remaining at the hospital and accepting its services, ratified Williams acts.

█ First, with regard to St. Joe's allegation of apparent authority, genuine issues of material fact remain regarding whether Williams was, at the time of Patient's admission, cloaked with apparent authority. Generally, a principal is liable for only the authorized acts of the agent. However a principal may be liable for the unauthorized acts of her agent where the agent is acting under apparent authority. "Apparent authority is that authority which a third person reasonably believes the agent to possess because of some manifestation from his principal." *Warner v. Riddell Nat. Bank*, 482 N.E.2d 772 (Ind.App.Ct.1985); *See also, Northwest Calf Farms, Inc. v. Poirier*, 499 N.E.2d 1165 (Ind.App.Ct.1986).

> [A]pparent authority rest on an estoppel and exists in the absence of actual authority. Accordingly, as to third persons acting in ignorance of any limitations on an agent's authority, the principal is bound by apparent authority and not by express authority, but an agent possesses such authority only if an appearance of authority is caused by the principal and the agent acts within the scope of such authority.

1 I.L.E., *Agency*, Ch. 4, § 54, p. 335 (1957). Neither party has presented sufficient facts in their respective affidavits to establish whether or not Williams had apparent authority. Patient has only said that she did not actually know of the assignment provision, however she has not said what happened on the day she was admitted to St. Joe. Similarly, Jovevski's affidavit concedes

that she has no personal knowledge of the events surrounding Patient's admission. Indeed, the only two people who seemingly could provide a first-hand account of what happened are Williams and Donna E. Purchase, the Patient Registration employee that witnessed Williams signing the document. (Jovevski Affidavit of July 1993, ¶ 2 and Exhibit A.) Mary Lou and William Isch have not introduced an affidavit from Williams, and St. Joe alleges that Purchase is no longer employed at St. Joe and her whereabouts are unknown. *Id.* at ¶ 3. Summary judgment on this issue is precluded due to the unresolved factual issues regarding whether Williams was acting with apparent authority when she signed the authorization document.

In addition, the parties affidavits also leave unresolved St. Joe's allegation that Mary Lou Isch is bound by the assignment of rights provision pursuant to the principle of ratification.

> Ratification as it relates to the law of agency is the adoption by one person of an act or contract performed or entered into in his behalf by another without authority, and after ratification the act stands as an authorized one and makes the whole act, transaction, or contract good from the beginning.

1 I.L.E., *Agency*, Ch. 8, § 121, p. 378 (1957). "[A]n agency relationship is not a prerequisite for ratification...." *Beneficial Mortgage. Co. v. Powers*, 550 N.E.2d 793 (Ind. App.Ct.1990) "Ratification is a question of fact and is defined as 'the adoption of that which was done for and in the name of another without authority.'" *Id.* (citing *State ex rel. Guaranty Bldg. and Loan Co. v. Wiley*, 100 Ind.App. 438, 196 N.E. 153, 154 (1935).

> Knowledge of all the material facts by the person to be charged with the unauthorized acts of another is an indispensable element of ratification. [citations omitted]. A ratification does not occur unless it appears that the act was performed for and on behalf of another, and not on account of the actor himself. [citations omitted]. One may ratify another's unauthorized acts through silence and acceptance of the ben-

efits attaching to such acts. [citations omitted].

*Id.* St. Joe argues that when Patient checked in and accepted medical care she ratified the assignment of rights. However, because the extent of what Patient knew remains a question of fact, (*See,* discussion at page 36–37 *infra.*), summary judgment in favor of St. Joe would be improper at this point. *See generally, Powers,* 550 N.E.2d 793; *Wiley,* 196 N.E. at 154.

Accordingly, with regard to the issue of standing, Plaintiffs', Mary Lou Isch's and William Isch's, motion for summary judgment against intervening Plaintiff, St. Joe, is denied. Intervening Plaintiff's, St. Joe's, motion for summary judgment against the defendants is denied, and judgment against Teamsters and in favor of St. Joe shall not be entered until such time as the validity of the assignment of rights can be determined.

### B. Attorney's Fees, Costs & Prejudgment Interest

Plaintiffs, Lutheran Hospital, Patient and Mr. Isch have moved for an award of attorneys fees, costs and prejudgment interest. On May 11, 1993 this Court ordered that the parties' motions for summary judgment address only the issue of liability for Patient's medical bills. Consistent with this order no other party has briefed the matters of fees, costs or interest. Given that the motion exceeds the scope of the Court's order, and because these issues have not been fully briefed, the motion for attorney's fees, costs and prejudgment interest is denied without prejudice. Any party that seeks an award of attorney fees, costs or prejudgment interest may now file a separate motion and brief in support, with further briefing to follow the schedule set forth in Local Rule 7.1.

## VI. CONCLUSION

For the reasons stated above Plaintiffs' Lutheran Hospital of Indiana, Mary Lou Isch and William Isch, motion for summary judgment is GRANTED against Teamsters and DENIED against all other parties. Intervening Plaintiff's, St. Joseph Medical Center of Fort Wayne, motion for summary judgment is DENIED. Defendant's, Teamsters Local 135 Welfare Fund, motion for summary judgment is DENIED. Defendants', Business Men's Assurance Company of America, Associated Insurance Companies, Inc., Acordia Local Government Benefits and Community and Family Services, motions for summary judgment are GRANTED.

Plaintiffs', Lutheran Hospital, Mary Lou Isch and William Isch, motion for attorneys' fees, costs and prejudgment interest is DENIED without prejudice. Any party now seeking an award of attorney's fees, costs or prejudgment interest shall file a separate motion and supporting brief with the briefing schedule to follow Northern District of Indiana, Local Rule 7.1. The deadline for filing such motions shall be established at the final pretrial conference set, *infra.*

The Court retains jurisdiction over this matter for the purpose of determining the validity of the assignment of benefit rights from Plaintiff, Mary Lou Isch to Intervening Plaintiff St. Joseph's Medical Center of Fort Wayne, and until the amount of Teamsters' liability is determined. This matter is now set for a final pre-trial conference to discuss all remaining issues for the 9th day of March, 1994 at 10:00 a.m.

Finally, pursuant to Rule 57 of the Federal Rules of Civil Procedure, the Court declares that:

1) Defendant, Teamsters Local 135 Welfare Fund must provide coverage for those medical and hospital bills incurred by Mary Lou Isch from June 1, 1991 until the present pursuant to the terms of the plan (*see* AE 40).

2) Mary Lou Isch and William Isch as well as their alleged assignees, Lutheran Hospital of Indiana and St. Joseph Medical Center of Fort Wayne, have no right to receive health insurance benefits from Defendants: Business Men's Assurance Company of America; Associated Insurance Companies, Inc. or Acordia Local Government, Inc.

3) Mary Lou Isch and William Isch as well as their alleged assignees, Lutheran Hospital of Indiana and St. Joseph Medical Center of Fort Wayne, have no

right to relief against Defendant, Community and Family Services Inc.